# EXHIBIT "25"

**1**

STATE OF PENNSYLVANIA
COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

BRENT R. MILLER,                          :
INDIVIDUALLY, AND AS                      :
PERSONAL REPRESENTATIVE OF                :
THE ESTATES OF JEHRID AND                 :
ANGELA MILLER, DECEASED,                  :
AND JACOB MILLER, A MINOR                 :
AND SARA MILLER, A MINOR                  :
                                          : DECEMBER TERM, 2008
vs.                                       : NO. 002760
                                          :
PIPER AIRCRAFT, INC. F/K/A                :
THE NEW PIPER AIRCRAFT,                   :
INC. F/K/A PIPER AIRCRAFT                 :
CORPORATION, LYCOMING A/K/A               :
LYCOMING ENGINES A/K/A                    :
TEXTRON LYCOMING                          :
RECIPROCATING ENGINE                      :
DIVISION, AVCO CORPORATION,               :
TEXTRON, INC. AND HARTZELL                :
PROPELLER, INC.                           :

VIDEOTAPED DEPOSITION OF ANN T. WILLAMAN
Taken in the above-entitled cause on August 26, 2010, at
10:00 A.M. on behalf of the Plaintiffs before Linda S.
Taylor, a Notary Public in and for the State of Rhode
Island, at Conferview, 2348 Post Road, Warwick, Rhode
Island.

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401)437-3366

**2**

1
2                    APPEARANCES
3   For the Plaintiffs:
      (Via Phone)
4      THE WOLK LAW FIRM
       1710-12 Locust Street
5      Philadelphia, PA 19103
       BY: BRADLEY J. STOLL, ESQ.
6
7   For the Defendants:
8      COZEN & O'CONNOR
       The Atrium - 4th Floor
9      1900 Market Street
       Philadelphia, PA 19103
10     BY: CATHERINE SLAVIN, ESQ.
          -and-
11        ANDREW C. SPACONE, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23          RHODE ISLAND COURT REPORTING
              747 NORTH MAIN STREET
24         PROVIDENCE, RHODE ISLAND 02904
                 (401)437-3366

**3**

1                    I N D E X
2   DEPONENT                        PAGE
3   ANN T. WILLAMAN
4   EXAMINATION BY MR. STOLL          5
5
6
7                  E X H I B I T S
8   EXHIBIT  DESCRIPTION            PAGE
9   PLAINTIFF'S
10    1    2/9/10 AFFIDAVIT OF ANN T. WILLAMAN    4
      2    1/12/10 AFFIDAVIT OF ANN T. WILLAMAN   4
11    3    COMMERCIAL PROPERTY RECORD CARD       50
      4    DOCUMENT ENTITLED FOCUS - 9 OF 9      57
12         DOCUMENTS - HIERARCHY
      5    REPORT OF TEXTRON INC.                79
13
14
15  DEFENDANT'S
16    6    8/20/10 ORDER                        107
      7    8/16/10 ORDER ENTERED BY CONSENT     107
17
18
19
20
21
22
23
24

**4**

1        (COMMENCED AT 10:00 A.M.)
2        (PLAINTIFF'S EXHIBIT 1 & 2 MARKED FOR
3        IDENTIFICATION)
4        THE VIDEOGRAPHER:  We are now
5   recording and on the record.  My name is Michael
6   Amato.  I'm a certified legal video specialist for
7   National Video Reporters, Inc.  Our business
8   address is 11 South Angell Street, Providence,
9   Rhode Island, 02906.
10       Today is August 26, 2010.  The time is
11  ten o'clock.  This is the deposition of Ann T.
12  Willaman in the matter of Brent R. Miller, et al,
13  Plaintiff, versus Piper Aircraft, Inc. f/k/a The
14  New Piper Aircraft, Inc., et al, Defendants, in
15  the Court of Common Pleas, Philadelphia County,
16  Case Number 002760.  This deposition is being
17  taken at 2348 Post Road, Suite 101, Warwick, Rhode
18  Island, on behalf of the Plaintiff.  The court
19  reporter is Linda Taylor of Rhode Island Court
20  Reporting.
21       Counsel will please state their appearances
22  and the court reporter will administer the oath.
23       MR. STOLL:  Good morning.  My name
24  is Bradley Stoll of The Wolk Law Firm and I

**5**

1  represent the Plaintiffs.
2  MS. SLAVIN: Catherine Slavin from
3  Cozen O'Connor. I represent Textron, Inc. and
4  Avco Corporation.
5  MR. SPACONE: Andrew Spacone,
6  Deputy General Counsel and Assistant Secretary,
7  Textron, Inc., representing Textron, Inc.
8  THE VIDEOGRAPHER: Thank you.
9  ANN T. WILLAMAN
10  Being duly sworn, deposes and testifies as follows:
11  THE REPORTER: Would you state your
12  full name for the record, please.
13  THE WITNESS: My full name is Ann,
14  A-n-n, middle initial T, Willaman,
15  W-i-l-l-a-m-a-n.
16  MR. STOLL: May I proceed?
17  THE VIDEOGRAPHER: Yes, you may.
18  EXAMINATION BY MR. STOLL
19  Q. Miss Willaman, good morning. I just have a few
20  things, preliminary things to say to you in the
21  beginning. First is this is a deposition. It's
22  being recorded by the stenographer and video
23  recorded. And it would be easier if you and I, if
24  we don't try to speak over each other so that the

**6**

1  stenographer can take an accurate record. And if
2  you have any questions about my questions, if
3  you don't understand them, please ask me to rephrase
4  and I will do my best to clarify what I'm asking.
5  I don't have any more instructions other than
6  that, but if we come across a glitch in the
7  deposition, I'm sure we'll address it. Can we
8  agree to those instructions?
9  A. Certainly.
10  Q. Okay, thank you.
11  And is there any reason today why you couldn't
12  give your best testimony?
13  A. There is no reason.
14  Q. Okay. Would you be kind enough to tell me what
15  your employment is?
16  A. Sir, I'm sorry, you said my employment?
17  Q. Yeah. What is your job title?
18  A. My job title is Assistant Secretary of
19  Textron, Inc.
20  Q. And I assume that means that Textron, Inc. is your
21  employer, as well?
22  A. That is correct.
23  Q. How long have you been employed at Textron, Inc.?
24  A. Since 1977.

**7**

1  Q. And would you be kind enough to go through the
2  positions that you held at Textron, Inc. for me?
3  A. I joined the company in February of 1977. At
4  that time, I was the coordinator of corporate
5  procedures. I worked in the Corporate Secretary's
6  Department, and my responsibility was to draft and
7  prepare the Textron, Inc. corporate procedures
8  manual. That took approximately two years. And in
9  1979, I applied for and received a job as a
10  paralegal in the Textron Corporate Legal
11  Department, and I had a number of positions within
12  the Corporate Legal Department up until just this
13  past December when I joined the Corporate
14  Secretary's Department once again. While I was in
15  the Legal Department, I was a paralegal, as I
16  mentioned before. I was also an administrator and
17  ended my tenure in Legal Department as executive
18  department administrator.
19  Q. Did I hear you correctly that you've been involved
20  in the Legal Department from 1979 until last
21  December?
22  A. That's correct.
23  Q. Okay. And since last December, is that when you
24  became the assistant secretary?

**8**

1  A. No, sir. I've been an --
2  Q. Did I state that correctly?
3  A. I've been an assistant secretary of Textron,
4  Inc. since 1985.
5  Q. Okay. I'm just still unclear as to what the change
6  was in December of 2009. Would you clarify that
7  for me?
8  A. I left the Legal Department and no longer
9  reported to the deputy general counsel in legal. I
10  now report to the corporate secretary directly and
11  assist him with corporate governance matters
12  involving the Textron, Inc. board of directors and
13  its board committees.
14  Q. Understood. Who is your immediate supervisor that
15  you refer to currently?
16  A. Terrence O'Donnell, O-d-o-n-n-e-l-l.
17  Q. And who was your immediate supervisor while were in
18  the Legal Department?
19  A. Arnold Friedman, F-r-i-e-d-m-a-n.
20  Q. And is Mr. Friedman an employee of Textron, Inc., I
21  assume?
22  A. Yes, he is.
23  Q. And I understand Mr. O'Donnell, is he the secretary
24  of Textron?

9

1    A.   He is the corporate secretary.
2    Q.   In your capacity as an assistant -- let me rephrase
3    that. I'm sorry.
4         In your capacity as an assistant secretary at
5    Textron, does that authorize you to act on behalf
6    of its subsidiaries?
7         MS. SLAVIN:  Object to the form.
8    You may answer.
9    A.   Being an assistant secretary of Textron
10   authorizes me to act on behalf of Textron, Inc.
11   Q.   Therefore, your position as an assistant secretary
12   at Textron does not authorize you to act on behalf
13   of subsidiaries such as Avco. Did I state that --
14   is that an accurate statement?
15   A.   That is correct.
16   Q.   Okay. And was that true while you reported to the
17   Legal Department?
18        MS. SLAVIN:  I'm just going to
19   object to the form, Brad, because –
20        MR. STOLL:  Sure.
21        MS. SLAVIN:  – she reported to the
22   Legal Department for a long time. So do you mean
23   at the --
24        MR. STOLL:  I understand.

10

1         MS. SLAVIN:  Do you mean at the
2    time -- at any time point during her tenure or
3    when she left?
4         MR. STOLL:  I understand the
5    objection.
6    Q.   Miss Willaman, I apologize.
7    A.   That's all right.
8    Q.   I do not know much of your background other than
9    what you've told me. And in my head so far, the
10   December of 2009 point marks a changing point in
11   your career where you've reported to Mr. O'Donnell.
12   And when I say reported to, I mean that's your --
13   your boss is Mr. O'Donnell. And before 2009, your
14   boss was Mr. Friedman. And my question about
15   whether or not you were authorized to act on behalf
16   of subsidiaries was current today your position as
17   assistant secretary underneath Mr. O'Donnell.
18        And then the next question is was that
19   different while you were reporting to Mr. Friedman?
20   Were you authorized to act on behalf of Textron
21   subsidiaries while Mr. Friedman was your superior?
22        MS. SLAVIN:  Object to the form,
23   but you can answer.
24   A.   I've been an assistant secretary of

11

1    Textron, Inc. since 1985. So I was reporting to
2    Mr. Friedman at that time through the end of 2009.
3    I am still an assistant secretary and have reported
4    to Mr. O'Donnell since January 1 of 2010. Being an
5    assistant secretary of Textron, Inc. authorizes me
6    to act on behalf of Textron, Inc.
7    Q.   Understand, thank you.
8         Have you ever been employed by Avco?
9    A.   No, I have not.
10   Q.   Have you ever acted as an assistant secretary to
11   Avco?
12   A.   Yes, I have.
13   Q.   Is an assistant secretary not necessarily an
14   employee? Are we not using that word correctly?
15        MS. SLAVIN:  Object to the form.
16   A.   I am not an employee of Avco Corporation and I
17   have not been an employee of Avco Corporation. I
18   am an elected assistant secretary of that
19   corporation.
20   Q.   Okay. So as an elected assistant secretary of
21   Avco, that does not deem you to be an employee of
22   Avco. Have I stated that accurately?
23   A.   That is correct.
24   Q.   Okay. What are your duties -- are you currently an

12

1    elected assistant secretary of Avco?
2    A.   Yes, I am.
3    Q.   I would like to start first with your position as
4    an assistant secretary with Textron. Would you be
5    kind enough to describe your job duties at Textron?
6    A.   My current job duties at Textron, Inc. include
7    assisting the corporate secretary with governance
8    matters involving the Textron, Inc. board of
9    directors and the committees of the board of
10   directors, and I also assist the company secretary
11   with other corporate governance matters, including
12   filings with the Securities and Exchange
13   Commission. In addition to those responsibilities,
14   I also am charged with providing oversight in
15   corporate governance area to Textron's various
16   subsidiary corporations.
17   Q.   As an assistant secretary at Avco Corporation,
18   would you be kind enough to describe your job
19   duties there?
20   A.   Certainly. I assist the company secretary of
21   Avco Corporation with the drafting of board and
22   shareholder minutes, holding meetings, making
23   regulatory filings as required with secretaries of
24   state, making sure that the company is properly

13

1     qualified in the jurisdictions where it conducts
2     business and administrative corporate governance
3     matters of that ilk.
4   Q.  Is the position of assistant secretary, is that an
5     officer position?
6   A.  Yes, sir, it is. It's an assistant officer
7     set forth in the bylaws.
8   Q.  Are there any other Textron officers who are also
9     officers of Avco Corporation?
10   A.  There are several assistant officers of
11     Textron, Inc. who are also assistant officers of
12     Avco Corporation.
13   Q.  And is that current? Are you responding to me
14     current as of today?
15   A.  Yes, sir.
16   Q.  Okay. Would you be kind enough to name those
17     individuals and their positions for me?
18   A.  Certainly. Andrew Spacone, S-p-a-c-o-n-e, is
19     an assistant secretary of Textron, Inc. and also an
20     assistant secretary of Avco Corporation.
21     Christopher Johnson, J-o-h-n-s-o-n, is an assistant
22     treasurer of Textron, Inc. and is an assistant
23     treasurer of Avco Corporation. Patricia Elmer,
24     E-l-m-e-r, is an assistant treasurer of

14

1     Textron, Inc. and is also an assistant treasurer of
2     Avco Corporation. And from memory, I think those
3     are the three.
4   Q.  Okay. Carl Buzawa, is he also -- excuse me. Do
5     you who Carl Buzawa is?
6   A.  Yes, I do.
7   Q.  I may not be saying -- I may not be pronouncing the
8     name right. If I did not, I apologize to
9     Mr. Buzawa. Who is Mr. Buzawa?
10   A.  Mr. Buzawa is a member of the legal staff of
11     Textron Systems Corporation.
12   Q.  Is he also an officer or member of Textron, Inc. in
13     any capacity?
14   A.  No, he is not.
15   Q.  Christopher Johnson, do you know who Mr. Johnson
16     is?
17   A.  Yes, I do.
18   Q.  Would you be kind enough to tell me what his role
19     is in either Textron Systems, Avco or
20     Textron, Inc.?
21     MS. SLAVIN: Object to the form.
22     You may answer.
23   Q.  Yeah, you can answer. Let me -- I'll rephrase the
24     question. Who is Mr. Johnson?

15

1   A.  Chris Johnson is an assistant treasurer of
2     Textron, Inc. He is in our Risk Finance Group.
3     And he is also an assistant treasurer of Avco
4     Corporation, and he is also an assistant treasurer
5     of other subsidiary corporations.
6   Q.  Do those -- would one of those other subsidiary
7     corporations, is that Textron Systems?
8     MS. SLAVIN: I'm going to object to
9     the form. We also haven't established -- a
10     subsidiary corporation of whom? Textron, Inc.?
11     Because you haven't established --
12     MR. STOLL: Yes.
13     MS. SLAVIN: -- you haven't
14     established corporate function in that regard.
15     MR. STOLL: I don't understand.
16   Q.  Textron Systems is a subsidiary of Avco, am I
17     correct, Miss Willaman?
18   A.  Yes. That is correct.
19     MS. SLAVIN: And so I didn't --
20   Q.  -- subsidiary?
21     MS. SLAVIN: I'm sorry. I didn't
22     mean to interrupt you. Would you repeat the
23     question?
24     MR. STOLL: That's okay.

16

1     MS. SLAVIN: I just want to make
2     sure I understand what you're asking, Brad. So do
3     you mind repeating the question?
4     MR. STOLL: I understand. I forgot
5     the question. Let me start over.
6   Q.  You mentioned that Mr. Johnson was also an
7     assistant secretary for other Textron, Inc.
8     subsidiaries. Did I repeat -- state that
9     accurately?
10   A.  That is correct.
11   Q.  Okay. Is one of those subsidiaries to whom
12     Mr. Johnson is an assistant treasurer, is that
13     Textron Systems?
14     MS. SLAVIN: I'm going to object to
15     the form because Textron Systems is not a
16     subsidiary of Textron, Inc.
17   Q.  Does Mr. Johnson have a role at Textron Systems?
18   A.  He is an employee of Textron, Inc. in the Risk
19     Finance Group and he oversees matters that require
20     him to execute certain documents on behalf of other
21     subsidiary corporations besides Textron, Inc.
22   Q.  Is he an assistant treasurer of Textron Systems?
23   A.  He is an assistant treasurer of Textron
24     Systems Corporation, yes.

17

1   Q.  All right.  That was the question I was trying to
2   get to, and I apologize it took so long to get
3   there.
4       The next individual I have a question about is
5   Mr. Ian Walsh.  Would you be kind enough to tell me
6   who Mr. Walsh is?
7   A.  Mr. Walsh is a corporate officer of Textron
8   Systems Corporation and is an employee of Textron
9   Systems Corporation.
10  Q.  Is Mr. Walsh an employee of Textron, Inc.?
11  A.  No, sir.
12  Q.  Is he an assistant treasurer of Textron, Inc.?
13  A.  No, sir.
14  Q.  Is he an officer in any capacity at Textron, Inc.?
15  A.  No, sir.
16  Q.  Is he -- does he have any other responsibilities to
17  any other Textron, Inc. subsidiary besides Avco
18  Systems, Textron Systems?
19      MS. SLAVIN:  I'm going to object to
20  the form.  And that question, Brad, is as of
21  August 26, 2010?
22      MR. STOLL:  Yeah.  That's today,
23  correct.  Yeah.
24      MS. SLAVIN:  Okay.

18

1       A.  Mr. Walsh is an officer of Avco Corporation,
2   he is an officer of Textron Systems Corporation,
3   and he is an officer of several other subsidiaries
4   of Avco Corporation.
5   Q.  Okay.  And these questions are current.  The time
6   period is 8/26/2010.  I will reask a lot of these
7   questions for different time periods, but for now
8   as we go through these lists, the time period is
9   now.
10      You mentioned Miss Elmer.  She is an assistant
11  treasurer at Textron, am I correct?
12  A.  She is an assistant treasurer of
13  Textron, Inc., that is correct.
14  Q.  Is she also an assistant treasurer of Avco
15  Corporation?
16  A.  Yes, she is.
17  Q.  Is she also an assistant treasurer at Textron
18  Systems?
19  A.  She is an assistant treasurer at Textron
20  Systems Corporation, yes.
21  Q.  Would you be kind enough to tell me who Richard
22  Millman is?
23  A.  Richard Millman is a retired employee.  He was
24  formerly the president of Textron Systems and then

19

1   he became the president of Bell Helicopter and
2   retired probably about a year or so ago.
3   Q.  Okay.  When Mr. Millman retired, does he no longer
4   have any obligations, employment obligations, to
5   Textron Systems or Bell Helicopter; is that
6   accurate?
7       MS. SLAVIN:  Object to the form.
8   A.  I don't know if he has any further obligations
9   with the company, either company.
10  Q.  Okay.
11  A.  But he is a retiree.
12  Q.  As a retiree, does that mean he no longer holds
13  those positions?
14  A.  That is correct.  He is no longer an officer
15  of either company.
16  Q.  Okay.  Robert Hemstreet, would you be kind enough
17  to tell me who is he?
18  A.  Mr. Hemstreet is also a former employee of
19  Textron, Inc.  He was an assistant treasurer, and
20  he left the company probably about two or three
21  years ago.
22  Q.  Was Mr. Hemstreet also an assistant treasurer of
23  Avco?
24  A.  Yes, he was.

20

1   Q.  Was he also an assistant treasurer of Textron
2   Systems?
3   A.  Yes, he was.
4   Q.  Would you be kind enough to tell me who Robert
5   Tobias is?
6   A.  Mr. Tobias was an assistant controller of
7   Textron, Inc.  He left the company, again, I would
8   say two or three years ago.
9   Q.  Did he also hold a position for Avco Corporation?
10  A.  Yes, he did.
11  Q.  Do you recall what that position is -- was?
12  A.  I'm sorry.  I don't recall.
13  Q.  Was it an officer position?
14  A.  Yes, it was, I do recall that, but I'm not
15  sure which officer position he held.
16  Q.  Understood.
17      Would you be kind enough to tell me who Thomas
18  Fredericks is?
19  A.  Mr. Fredericks is a former assistant treasurer
20  of Textron, Inc.  He left the company three or four
21  years ago.
22  Q.  Was Mr. Fredericks an assistant treasurer of
23  Avco?
24  A.  He was an officer of Avco.  I'm afraid I don't

21

1    remember his exact title.
2    Q.   Was he also an officer of Textron Systems?
3    A.   He was also an officer of Textron Systems
4        Corporation.
5    Q.   Mr. Kemp.  I don't have a first name for Mr. Kemp,
6        I apologize to him if he reads this transcript, but
7        can you identify who Mr. Kemp is?
8    A.   It's Robert Kemp, and he is the general
9        counsel of Textron Systems Corporation.
10   Q.   Does he hold any positions at Textron, Inc.?
11   A.   No, he does not.
12   Q.   Does he hold any positions at Avco Corporation
13       aside from the subsidiary, Textron Systems?
14           MS. SLAVIN:  Object to the form.
15   A.   He is a secretary of Textron Systems
16       Corporation and also the treasurer and he is a
17       member of the board of directors.
18   Q.   Okay.  Would you be kind enough to tell me who
19       Arnold Friedman is?
20   A.   Mr. Friedman is vice-president and deputy
21       general counsel of Textron, Inc.
22   Q.   Does Mr. Friedman hold any positions at Avco
23       Corporation?
24   A.   No, he does not.

22

1    Q.   Does Mr. Friedman hold any positions at any of the
2        subsidiaries of Avco Corporation?
3    A.   Yes.  He is a vice-president of Textron
4        Systems Corporation and he is also a vice-president
5        of several other Avco Corporation subsidiaries.
6    Q.   Mr. David Roy, would be kind enough to tell me who
7        Mr. Roy is?
8    A.   I'm afraid I don't recognize that name.
9    Q.   Do you recognize the name Ellen Lord?
10           THE REPORTER:  I'm sorry.  Ellen?
11   A.   Lord?
12   Q.   Yes, ma'am.  L-o-r-d.
13   A.   Yes.  Miss Lord is the general manager of the
14       AAI subsidiary.
15   Q.   Is AAI a subsidiary of Textron, Inc.?
16   A.   It's a subsidiary of Avco Corporation.
17   Q.   Does Miss Lord hold any positions at Textron, Inc.?
18   A.   No, she does not.
19   Q.   Do you know who Mr. Jeffrey Copeland is?
20   A.   Mr. Copeland is an officer of Avco
21       Corporation.  He's an employee of the Lycoming
22       business unit.
23   Q.   Does Mr. Copeland have any position at Textron,
24       Inc.?

23

1    A.   No, sir, he does not.
2    Q.   John Condon (phonetic), would you be kind enough to
3        tell me who Mr. Condon is?
4    A.   Mr. Condon is a retired Textron Systems
5        Corporation employee.  He was their chief financial
6        officer.  He retired at year end.  He was also a
7        director of Textron Systems Corporation.
8    Q.   Did Mr. Condon hold any positions at Textron, Inc.?
9    A.   No, sir, he did not.  He does not.
10   Q.   Do you know Miss Lesley Hamlin?
11   A.   Yes.  Miss Hamlin is a former Textron Systems
12       Corporation employee.  She was a lawyer, and my
13       recollection is that she was an assistant secretary
14       of Textron Systems Corporation.  She has not been
15       employed by the company for two, three years.
16   Q.   Does she hold any positions at Textron, Inc.?
17   A.   No, she did not.
18   Q.   Mr. Mark Catizone.  Do you know Mr. Mark Catizone?
19   A.   Mr. Catizone is an employee of Textron Systems
20       Corporation.
21   Q.   Does Mr. Catizone hold any positions at
22       Textron, Inc.?
23   A.   No, sir.
24   Q.   Do you know Mr. Mark Lovejoy?

24

1    A.   I don't know a Mark Lovejoy, no.
2    Q.   Norman Richter?
3    A.   Mr. Richter was the vice-president, Taxes of
4        Textron, Inc.  He left the company at year end,
5        2009.
6    Q.   I'm sorry.  Did you say vice-president of
7        Textron, Inc. or was there something in between
8        there?
9    A.   He was vice-president, Taxes, t-a-x-e-s, of
10       Textron, Inc.
11   Q.   Thank you.
12   A.   Hm-mmm.
13   Q.   Did Mr. Richter hold any positions with Avco
14       Corporation?
15   A.   No, he did not.
16   Q.   Did he hold any positions with any of Avco
17       Corporation subsidiaries?
18   A.   He was a vice-president of Textron Systems
19       Corporation.
20   Q.   Mr. Robert Buckley, would you be kind enough to
21       tell me who Mr. Robert Buckley is?
22   A.   I'm not recalling Mr. Buckley.
23   Q.   Okay.  Do you recall a Mr. Rodney Willis?
24   A.   Mr. Willis was a former Textron Systems

## 25

1    Corporation employee. I believe he left the
2    company a year or so ago.
3    Q.  Did Mr. Willis hold any positions at Textron, Inc.?
4    A.  No, sir.
5    Q.  Mr. Stephen Schultz, do you know who Mr. Stephen
6    Schultz is?
7    A.  I'm not recalling Mr. Schultz.
8    Q.  Mr. Thomas McNamara, do you recall who Mr. McNamara
9    is?
10   A.  Mr. McNamara is an officer of Textron Systems
11   Corporation.
12   Q.  Is Mr. McNamara also an officer of Textron, Inc.?
13   A.  No, sir.
14   Q.  Okay. Mr. Christopher Johnson, how long has
15   Mr. Christopher Johnson been an assistant treasurer
16   at Textron, Inc., Avco Corp., Textron Systems?
17            MS. SLAVIN: I'm going to object to
18   the form. Do you mean for each or do you mean all
19   at the same time or something else?
20   Q.  Well, let's start with Textron, Inc. first.
21   A.  I don't have the exact number of years that he
22   has been with Textron or an assistant treasurer.
23   It would be probably approximately four or five.
24   Q.  Do you know how long he was assistant treasurer for

## 26

1    Avco.
2    A.  About the same amount of time.
3    Q.  As well as my next question for the assistant
4    treasurer at Textron Systems?
5    A.  Again, about the same amount of time.
6    Q.  Have any Textron employees or officers also held
7    the position of vice-president of Avco?
8            MS. SLAVIN: At what point in time?
9    Q.  I'm going to ask for your recollection,
10   Miss Willaman. I don't want to put a timeframe on
11   it.
12       Do you recall any instance where an employee
13   or officer of Textron, Inc. also served as the
14   vice-president of Avco Corporation?
15   A.  Yes, sir.
16   Q.  Okay. Would you explain to me why you gave an
17   affirmative answer to that question?
18   A.  When Textron originally acquired Avco
19   Corporation back in 1985, Avco Corporation was a
20   smaller version of a Textron, Inc. It had a
21   corporate headquarters, it had business units,
22   subsidiaries and the like. And when we acquired
23   it, many of the Avco Corporation senior officers
24   came to Providence and also were officers of

## 27

1    Textron, Inc. Certain members of the Avco board
2    joined the Textron board. And for a certain amount
3    of time while those people were still here, they
4    had titles of vice-president or executive
5    vice-president of Textron, Inc. and they also were
6    officers of Avco Corporation.
7    Q.  Are you able to put a timeframe on that scenario
8    which you just explained for me?
9    A.  That's -- it has evolved over time, and I
10   would say, you know, over the -- there aren't any
11   vice-presidents of Textron, Inc. who are
12   vice-presidents of Avco. That's been for, I would
13   say, four, five, six years. It's been a while.
14   Q.  Okay. Just so the record's clear, the way that you
15   phrased that last statement was a little bit
16   different, and I just think -- I don't think it was
17   intentional or anything. Let me rephrase the
18   question.
19   A.  Okay.
20   Q.  Are there any employees in the past -- let's begin
21   with the year 2000. Since the year 2000, have
22   there been any Textron employees who also held the
23   position of vice-president of Avco Corporation?
24   A.  I would have to go back to the minute book and

## 28

1    check that. I just don't have the recall sitting
2    here to be able to tell you that exact time period.
3    Q.  I understand. Are you able to tell me currently
4    today, is any employee or officer of Textron, Inc.
5    also holding the position of vice-president of
6    Avco?
7    A.  I do.
8    Q.  You do?
9    A.  Yes, sir.
10   Q.  Okay. Before you -- when did you obtain that
11   position?
12            MS. SLAVIN: Which position?
13   Vice-president of Avco?
14            MR. STOLL: I'm sorry. What —
15   yes, ma'am.
16   A.  Vice-president of Avco Corporation? Again, I
17   would have to check the minute book for the exact
18   date. It has been a number of years that I've held
19   that.
20   Q.  Is there only one? I'm sorry.
21   A.  Currently, I am the only Textron, Inc.
22   employee who holds the title of vice-president of
23   Avco Corporation.
24   Q.  Is there only one vice-president of Avco

29

1  Corporation?
2  A.  No, sir.  There are numerous vice-presidents.
3  Q.  Numerous in my mind is a lot.  Would you nail it
4  down a little bit better?
5  A.  I think there are probably maybe five, six.
6  Q.  Of those five or six vice-presidents of Avco, do
7  any of those individuals also hold employment with
8  Textron, Inc.?
9  A.  No, sir.
10 Q.  Okay.  Can you identify any other Textron employees
11 who at one point also held the role of
12 vice-president of Avco Corporation?
13       MS. SLAVIN:  I'm going to object to
14 the form and we're covering a 25-year period, but
15 you can answer.
16 A.  Current Textron, Inc. employees?
17 Q.  No, ma'am.  To your recollection, other than
18 yourself, has there ever been an instance where a
19 Textron employee also held the role of one of the
20 vice-presidents of Avco Corporation?
21 A.  Yes.
22 Q.  Is it more than one individual?
23 A.  Yes.
24 Q.  Are you able to name them for me?

30

1  A.  That's a long time to go back.  I can name
2  some that I know have held the position.  They no
3  longer do.  Some of them are no longer employed by
4  the company, but...
5  Q.  I think the way that -- I think the way that I
6  would like to do this is if you can, I can only ask
7  you for your recollection, and if you could
8  recollect by saying the person's name and their job
9  at Textron and the position they held at Avco, I
10 think that might be the easiest for the record to
11 be clear, if you don't mind.
12 A.  Mr. Friedman was a vice-president of Avco
13 Corporation.
14 Q.  While he was vice -- I'm sorry to interrupt, but
15 while he was vice-president of Avco, what was his
16 correlating role at Textron, Inc.?
17 A.  He was a vice-president of Textron, Inc.
18 Q.  Okay.  You may continue identifying those
19 individuals who you recall.
20 A.  Mr. Richter, R-i-c-h-t-e-r, Norman was an
21 officer of Textron, Inc. and Avco Corporation.  He
22 was vice-president of Taxes, Textron, Inc.
23 Q.  What was his position at Avco?
24 A.  Vice-president, Taxes.

31

1  Q.  Okay.
2  A.  Mary Lovejoy, L-o-v-e-j-o-y, Mary, M-a-r-y.
3  Q.  I had Mark before.  I think it's Mary.
4  A.  Oh, okay.  Then I -- she was -- she is
5  vice-president and treasurer of Textron, Inc.  She
6  was a vice-president of Avco Corporation.  These
7  are recent folks that I can recall.
8  Q.  Is there anybody else that you can recall?
9  A.  Back in the '80s when we acquired the company,
10 individuals like Gary Atwell who was an officer of
11 Textron, Inc. and also an officer of Avco
12 Corporation.  Robert Bauman, B-a-u-m-a-n, who was
13 the former chairman of Avco was also an officer of
14 Textron, Inc.  Dennis Little was the chief
15 financial officer of Avco Corporation, was also an
16 officer of Textron, Inc.  I'm exhausting my memory
17 here.
18 Q.  I know.  How about, and I apologize since he's
19 sitting right there at the table to refer to him in
20 the third person, Mr. Spacone, was he also a
21 vice-president of Avco while holding a role at
22 Textron, Inc.?
23 A.  I believe he was a vice-president of Avco
24 Corporation as well as an assistant secretary, and

32

1  he was an assistant secretary of Textron, Inc. --
2  is, excuse me.
3  Q.  I don't want to jog your memory too much, but we've
4  established the current list and some of the prior
5  ones.  I'd like to focus in on the 2007 time
6  period.  We're here in a case involving an accident
7  that occurred around 2007.
8  A.  Okay.
9  Q.  And are you able to recall the roles of the
10 individuals who we just mentioned at that time
11 period?
12       MS. SLAVIN:  Which individuals?
13 Q.  Well, that would be the list of people who I've
14 gone through.  And I can go through them one by one
15 asking the questions 2007 if that would make you
16 feel less uncomfortable, if you will.
17       Let me do it that way.  Christopher Johnson,
18 well, we already did Mr. Johnson.
19       Frank Tempesta, what were his roles in Avco
20 and Textron at or around 2007?
21 A.  Mr. Tempesta was the president of Textron
22 Systems Corporation.  He was also a member of its
23 board of directors.  And he was also president of
24 Avco Corporation and a member of its board of

33

1    directors.
2  Q.  In 2007, Mr. Tempesta did not have a role at
3      Textron. Did I state that accurate?
4  A.  He was not an officer of Textron, Inc., no.
5  Q.  How about this. In 2007, can you identify the
6      individuals who were officers of Textron, Inc. as
7      well as Avco Corporation?
8  A.  Again, I would have to check the minute book
9      to give you an answer. I don't -- I'm unable to
10     keep track of who was an officer for specific
11     periods of time.
12  Q.  Let me just from my notes some of people who we did
13     identify having those roles at Textron and Avco,
14     just allow me to ask the question for 2007.
15  A.  Okay.
16  Q.  Mr. Hemstreet, do you recall his roles at or around
17     2007?
18  A.  I'm trying to recall when he left the company.
19     It was around 2007 or 2008. I'm not sure. Just
20     before he left the company, he was an assistant
21     treasurer of Textron, Inc. and he was also an
22     assistant treasurer of Avco Corporation. I just
23     don't recall the exact year in which he left the
24     company.

34

1  Q.  Okay. Mr. Tobias, I believe my notes say he was
2      assistant controller of Textron, Inc. and an
3      officer at Avco you didn't recall. Was that so in
4      2007?
5  A.  Again, that was about the time that he left,
6      but his roles were as you have stated them. He was
7      an assistant controller of Textron, Inc. and he was
8      an Avco Corporation officer. I just don't happen
9      to recall what his title was.
10  Q.  Okay.
11  A.  But he also --
12  Q.  That would be accurate at around --
13  A.  He also left at around that 2007 period.
14  Q.  Okay. Mr. Fredericks, I have him as an assistant
15     treasurer of Textron, Inc. and an officer of Avco
16     and Textron Systems. Was that accurate at or
17     around 2007?
18  A.  I think he left slightly earlier than that,
19     but his final -- before he left, his role at
20     Textron was an assistant treasurer of Textron, Inc.
21     and he was also an assistant treasurer of Avco
22     Corporation, I believe.
23  Q.  Let me ask this question. Does Timothy Harrington
24     have a position at Textron, Inc.?

35

1  A.  No, he does not.
2  Q.  Okay. Can you tell me how many -- if Mr. Friedman
3      held the position of vice-president of Avco and
4      vice-president of Textron, what years did he hold
5      those two positions?
6      MS. SLAVIN: Object to the form.
7  A.  I recall that he was elected a vice-president
8      of Avco at the time we acquired Avco Corporation in
9      1985, and I do not recall when he left that officer
10     position.
11  Q.  Do you recall when he was vice-president of -- was
12     he vice-president of Textron at that time, as well?
13  A.  Yes.
14  Q.  Okay. Is Mr. Friedman still employed or is he
15     retired?
16  A.  He is still employed.
17  Q.  Does he currently hold those positions,
18     vice-president of Avco and Textron?
19  A.  He is a vice-president and the deputy general
20     counsel for Textron, Inc. He does not hold an
21     office currently with Avco Corporation.
22  Q.  Okay. And do you recall when Mr. Friedman left his
23     role at Avco?
24  A.  I do not recall when he left the role. I'm

36

1      sorry.
2  Q.  Okay. I believe Mr. Condon was the CFO of Textron
3      Systems and a director at Textron, Inc.; is that
4      accurate?
5  A.  No, that is not accurate. He was the chief
6      financial officer for Textron Systems Corporation
7      and was a director of Textron Systems Corporation.
8  Q.  Okay. My notes are wrong then.
9      Miss Hamlin, Lesley Hamlin, I have her as a
10     former Textron Systems employee and assistant
11     secretary at Textron, Inc.; is that accurate?
12  A.  No, sir, it is not. She was an assistant
13     secretary of Textron Systems Corporation.
14  Q.  I apologize. I tried to do this the best I could.
15     How about Mr. Richter, I believe he was also
16     an officer of Textron and an officer of Avco in
17     2007?
18  A.  He was an officer of Textron, Inc. in 2007. I
19     do not recall if he was still an officer of Avco
20     Corporation in 2007.
21  Q.  Miss Willaman, have you ever been employed as an
22     employee or officer at Textron Systems?
23  A.  I have never been employed by Textron Systems
24     Corporation. I am an elected officer of Textron

37

1    Systems Corporation.
2    Q.   And what is that -- what position is that for?
3    A.   Assistant secretary of Textron Systems
4    Corporation.
5    Q.   Are there any other Textron employees currently
6    holding elected positions for Textron Systems?
7    A.   Yes.  There are a number of Textron, Inc.
8    employees who are officers of Textron Systems
9    Corporation.
10   Q.   Can you tell me how many, what that number is?
11   A.   I believe it will be six, six or seven.
12   Q.   And I have the same question for Avco Corporation.
13   I apologize if I've asked it before, but are there
14   any -- currently, are there -- how many officers,
15   elected positions for Avco Corporation -- let me
16   rephrase that since I stuttered.
17       How many employees of Textron, Inc. also hold
18   elected positions at Avco Corporation?
19       MS. SLAVIN:  And the question is as
20   of August 26, 2010?
21       MR. STOLL:  Currently, yes.
22   A.   I think there are six.
23   Q.   Could you name them for me, please?
24   A.   Mark Bamford, B-a-m-f-o-r-d, Patricia Elmer,

38

1    E-l-m-e-r, Christopher Johnson, J-o-h-n-s-o-n,
2    James Cournoyer, C-o-u-r-n-o-y-e-r.  Did I say
3    Mr. Johnson, Christopher Johnson?
4    Q.   Yes, ma'am.
5    A.   I am also a Textron, Inc. employee and an
6    officer of Avco Corporation.  I think I'm missing
7    one.  And Mr. Spacone.
8    Q.   Are there certain meetings that are required of
9    Avco as a corporation, yearly annual meetings of
10   officers and directors?
11   A.   Yes.
12   Q.   Okay.  And are the people that you named just now,
13   Mr. Bamford, Spacone, Miss Elmer, Mr. Johnson,
14   Cournoyer and yourself, do you all attend those
15   meetings?
16   A.   Avco Corporation does not always have meetings
17   in person.  The directors, pursuant to Delaware
18   law, are permitted to act by unanimous consent,
19   unanimous written consent in lieu of a meeting and
20   also in lieu of an annual meeting.
21   Q.   Is that the practice at Avco is to operate under
22   that provision of Delaware law --
23   A.   Generally, yes.
24   Q.   -- for meetings?

39

1    A.   Yes.
2    Q.   Okay.  How many other directors of Avco Corporation
3    are there that we have not listed?
4    A.   There are three directors of Avco Corporation,
5    Mr. Kemp, Mr. Sullivan, Robert Sullivan, and
6    Mr. Strader, Frederick Strader.  That's
7    S-t-r-a-d-e-r.
8    Q.   Thank you.  So all together, there are currently
9    nine directors of Avco --
10       MS. SLAVIN:  Objection.
11   Q.   -- is that correct?
12       MS. SLAVIN:  I think you're
13   misunderstanding the distinction between officers
14   and directors.  So I'm going to object.
15   Q.   What is the distinction between officers and
16   directors that I am stating incorrectly, ma'am?
17   A.   There are three directors of Avco Corporation.
18   Q.   Okay.
19   A.   Mr. Sullivan, Mr. Kemp, and Mr. Strader.
20   Q.   Okay.  And the individuals before, the six who we
21   have listed, they are officers?
22   A.   They are assistant officers of Avco
23   Corporation, yes.
24   Q.   Understood.

40

1    I've sent a stack of documents.  I promise you
2    we won't go through every page.  It's more or less
3    better to be prepared than not to.
4    I've asked the court reporter to mark your
5    affidavit without the caption as Exhibit 1.
6    A.   Yes.
7    Q.   And, Miss Willaman, I'm going to ask the obvious,
8    but would you be kind enough to identify what that
9    document is?
10   A.   It is an affidavit that I signed before a
11   notary on February 9 of 2010 in connection with
12   this matter.
13   Q.   Okay.  I noticed there's no caption for this
14   affidavit, and sometimes we lawyers put captions on
15   these if they pertain to a particular matter.  But
16   with that preface, do you know is this affidavit
17   used in other forums, as well?
18       MS. SLAVIN:  Object to the form.
19   A.   I have been called upon to give affidavits
20   which cover many of these same statements before.
21   Q.   Okay.  But this particular affidavit was used in
22   this case.  I think we can all agree on that.  And
23   my question to you is do you have any personal
24   knowledge as to whether or not this affidavit,

41

1    Exhibit 1, has been used in any other cases?
2    A.  No, sir, I don't.
3  Q.  Okay.  Did you draft this affidavit?
4    A.  Yes, sir.
5  Q.  Okay.  Did anybody aid you in drafting this
6    affidavit?
7        MS. SLAVIN:  Object to the form.
8    A.  I drafted the affidavit and because
9    Textron, Inc. is a defendant in the litigation and
10   Mr. Spacone is Textron's counsel, I did ask him to
11   review it and get his legal advice on it, but
12   these -- I'd have drafted this and these are --
13   this is my knowledge.
14 Q.  Okay.  And if we look at what's been marked as
15   Exhibit 2 which is another affidavit that I've
16   received that you've executed, it's slightly
17   different.  This one has a caption.  This one
18   predates Exhibit 1 by approximately a month or so
19   if I've gotten my dates correct.  I have a notary
20   of January 12, 2010, for Exhibit 2.
21   A.  Hm-mmm.
22 Q.  And a notary of February 9, 2010 for Exhibit 1.
23       Is it accurate that some of the information
24   contained on Exhibit 1 is derived from Exhibit 2?

42

1        MS. SLAVIN:  I'm going to object to
2    the form of that question.
3        And, Brad, I'm just going to put this on the
4    record.  Judge Abramson's August 20, 2010, order
5    limited Miss Willaman's deposition to the
6    affidavit marked as Exhibit 1.  I've reviewed
7    Exhibit 2 which is from the Johnson case that was
8    pending in the United States District Court for
9    the Eastern District of Missouri.  To the extent
10   that a lot of the statements in Exhibit 1 are
11   similar to Exhibit 2, I'm going to give you some
12   leeway, but I just don't want us to go crazy here.
13   I think it's fair to ask her about the preparation
14   of Exhibit 1.  I don't have difficulty if you
15   don't get carried away asking her about Exhibit 2,
16   but I am going to have a problem if we go further
17   into matters that are beyond the scope of Judge
18   Abramson's order.
19       You're free to ask her whatever you want, her
20   being the witness, about Exhibit 1 in detail.  And
21   I've given you a lot of leeway, even though a lot
22   of the questions that you've asked in the past
23   hour I think are beyond the scope of Exhibit 1,
24   but, again, I'm giving you leeway.  So I just

43

1    don't want us to go crazy here.
2        And with that objection, I'm going to allow
3    the witness to answer, although she probably
4    doesn't remember what the question is at this
5    point.
6    A.  If you could please repeat the question.
7  Q.  That's okay.  You know, Miss Willaman, since
8    Miss Slavin has put her position on the record, I
9    feel compelled to provide mine.  So if I could --
10   if you would excuse me for a second.
11       MR. STOLL:  In response to
12   Miss Slavin's objection, I disagree.  All of the
13   matters of which I have just discussed with
14   Miss Willaman are relevant and within the
15   guidelines of the court's order.  The court did
16   say that I was free to cross-examine Miss Willaman
17   on matters contained in the affidavit and I was
18   not bound by the four corners of it and I am sure,
19   Miss Slavin, that you will object when you feel
20   that I've gone beyond.  And according to the Rules
21   of Civil Procedure, it's objection to form,
22   foundation, to withhold a privilege or if you feel
23   that I've gone astray of the order, I'm sure you
24   will chime in.

44

1    I just want to make sure that, since we are
2    here giving testimony, that no speaking objections
3    which, you know, invoke accusations of coaching
4    witnesses and the like will be given, and I'm sure
5    that we will not have that issue today since we've
6    worked together in the past and we will go
7    smoothly.
8        For now, Exhibit 2 is to me obviously a point
9    where Exhibit 1 may have generated from.  So,
10   Miss Slavin, I do intend to ask about how
11   Exhibit 2 was generated since some of the language
12   is strikingly similar.  With that, if there's
13   nothing else, we can go forward.
14       MS. SLAVIN:  Well, I think -- I'm
15   sorry, Brad.  I think you're making an assumption.
16   I think you're making an assumption about Exhibits
17   1 and 2, and I think the better course would be to
18   find out whether the witness drafted it.  And,
19   again, this is not the Johnson case.  This is the
20   Miller case.  And the judge, Judge Abramson, did
21   say that you can cross-examine Miss Willaman on
22   Exhibit 1.
23       I don't know that I agree on beyond the four
24   corners of since he subsequently entered a written

45

```
1    order that said -- that I'm going to ask be marked
2    Exhibit 3, that says, "Plaintiffs are limited to
3    taking the deposition of Ann Willaman on her
4    affidavit," which I'm going to ask that the order
5    be marked as Exhibit 3. And I think, Brad, we can
6    go through and deal with each question in due
7    course. How about that?
8         MR. STOLL: That's fine. Before we
9    mark the order, I don't mind the order being
10   marked, but just allow me to make my record with
11   the documents that I have in a chronological, not
12   chronological, but in a logical order for me and
13   then at some time at the end, you can put your
14   order as an exhibit.
15        MS. SLAVIN: It's Judge Abramson's
16   order, not my order, but I don't care what it's
17   marked as.
18        MR. STOLL: When I say your order,
19   I mean the order in front of you is in your
20   possession. It belongs to you, your order. I
21   don't suggest that you drafted it, of course.
22   Let's continue.
23        MS. SLAVIN: I don't care what it's
24   marked as. I just want it in the record and I
```

46

```
1    want to be clear that we are not in violation of
2    the protective order that was entered by the
3    court.
4         But, yes, let's continue.
5    Q.   Okay. Miss Willaman, did you draft Exhibit 2?
6    A.   Yes, sir, these are my statements.
7    Q.   These are your statements, but did you sit down at
8    the computer and type this yourself?
9    A.   I probably typed a draft of it and then
10   whoever our counsel was for -- in this district put
11   it into the appropriate template form. I would
12   not -- excuse me. I would just not know how the
13   Eastern District of Missouri liked its affidavits
14   to appear.
15   Q.   I understand, and I am not making any allegations
16   that it's improper. I am just trying to find the
17   genesis of Exhibit 1.
18        Is it -- when you drafted Exhibit 1, did you
19   cut and paste from Exhibit 2?
20   A.   If the statement applies and is true, I would
21   use the same statement and have in a number of
22   affidavits.
23   Q.   Going to paragraph two of your affidavit, and allow
24   me to read it.
```

47

```
1         MS. SLAVIN: Which one?
2         MR. STOLL: I'm sorry. We're going
3    to be on Exhibit 1. I have no further questions
4    on Exhibit 2.
5    Q.   Paragraph two states, "I am employed by
6    Textron, Inc. ("Textron") as Assistant Secretary.
7    I have been employed in this position for the past
8    twenty-five years and have been employed by Textron
9    for thirty-three years."
10        Could you also identify in paragraph two --
11   let me rephrase that. Could you also identify the
12   positions, all positions, that you have also held
13   on behalf of Avco Corporation?
14        MS. SLAVIN: At any period of time
15        MR. STOLL: At any period of time
16   identified in paragraph two.
17   A.   I have been an assistant secretary of Avco
18   Corporation since Textron, Inc. acquired it in
19   1985.
20   Q.   Have you held any other positions with Avco?
21   A.   I was also -- I am also a vice-president of
22   Avco Corporation, and I believe I was elected to
23   that title at some point later than 1985. I don't
24   recall. It's been quite a long time.
```

48

```
1    Q.   Do you recall the individual who you replaced, if
2    any?
3    A.   I'm not sure that I replaced anyone. There
4    might have been assistant secretaries of Avco
5    Corporation who did not come to Providence when we
6    acquired them, but I don't -- I don't know their
7    names. I'm not familiar with them.
8    Q.   Does being the assistant secretary of Avco
9    authorize you to execute documents on behalf of
10   Avco?
11   A.   It authorizes me to execute documents on
12   behalf of Avco Corporation, yes.
13   Q.   And have you, in fact, in the past executed
14   documents on behalf of Avco?
15   A.   I have executed documents on behalf of Avco
16   Corporation, yes.
17   Q.   Have you executed any documents on behalf of Avco
18   in connection with litigation?
19   A.   I may have offered an affidavit as an
20   assistant secretary of Avco Corporation, most
21   likely have. I don't recall, frankly. But as an
22   assistant secretary, that would be an expected
23   responsibility.
24   Q.   And I assume that the same answer would apply for
```

49

1    being vice-president, that that would also
2    authorize you to execute documents on behalf of
3    Avco Corporation?
4    A.  Yes, it would.
5    Q.  Would that also authorize you to execute documents
6    on behalf of Avco Corporation's operating
7    divisions?
8    A.  Yes, it would.
9    Q.  And is it also accurate to say that any of the
10   assistant secretaries of Avco who are also
11   employees of Textron, Inc. have that same ability
12   to execute documents on behalf of Avco?
13        MS. SLAVIN:  I'm going to object to
14   the form.
15   A.  Yes, they do.
16   Q.  And is it also accurate to say that the
17   vice-presidents of Avco who are also employees of
18   Textron, Inc. have the ability to execute documents
19   on behalf of Avco?
20   A.  I'm the only employee of Textron, Inc. who is
21   a vice-president of Avco Corporation.
22   Q.  Okay.  So I guess we would revert back to your
23   original answer that you are authorized to?
24   A.  Yes, I am.

50

1    Q.  Understood.
2        What is the address of your employer?
3    A.  My employer is located at 40 Westminster, one
4    word, W-e-s-t-m-i-n-s-t-e-r, Street in Providence,
5    Rhode Island.  Zip code is 02903.
6    Q.  And could you tell us is -- that's a building at
7    that address, am I correct?
8    A.  Yes, it is.
9    Q.  And is that -- how many floors are in that
10   building?
11   A.  There are 24 floors.
12   Q.  Do you know who that building is owned by?
13   A.  It's owned by a wholly owned subsidiary of
14   Textron, Inc., Textron Realty Corporation.
15        MR. STOLL:  Okay.  And if I may to
16   Linda, our court reporter.  In the stack of
17   documents, I have one that has a page on it which
18   says Exhibit 5.  I would like -- we can discard
19   the cover page, Exhibit 5, because this is
20   obviously going to be Exhibit 3.
21        (PLAINTIFF'S EXHIBIT 3 MARKED FOR
22        IDENTIFICATION)
23        MS. SLAVIN:  I'm going to lodge an
24   objection to Exhibit 3, Brad, as beyond the scope

51

1    of the order from Judge Abramson.  I don't think
2    there's anything in Exhibit 1 that references real
3    property.  I'm also going to note that these
4    objections apparently -- these documents that
5    you have sitting in front of us here in Warwick
6    are documents from -- they appear to be from the
7    Johnson litigation which is obviously not this
8    case, and it also includes an affidavit -- a
9    declaration of Philip, with one "I," J. Ford of
10   your office relating to Ann Willaman, and it
11   appears that you intend to ask the witness whose
12   deposition has been limited to the matters in her
13   affidavit about matters from the Johnson case; is
14   that correct?
15        MR. STOLL:  Are you instructing the
16   witness not to answer, Miss Slavin?  Because I
17   would really think that we need to get the
18   questions on the record and, if there's an
19   instruction not to answer, that needs to be clear
20   so we can bring that to the court's attention.
21        MS. SLAVIN:  Hm-mmm.  We do need to
22   bring it to the court's attention.
23        MR. STOLL:  It's not my intention
24   to divulge to you, it is not my desire or

52

1    intention to divulge to you my thought process, my
2    thinking or my strategy with this deposition.
3        I have a document that I have not even asked
4    a question about.  You've lodged your objection
5    which appears to be a warning that you believe I'm
6    going beyond the scope.  Once I get there, you can
7    instruct the witness not to answer.  But before
8    then, let's see what the question is first.
9        MS. SLAVIN:  I agree, Brad, and I
10   will do that.  And I'm just putting on the record
11   now that we have a deposition that has granted a
12   protective order and limited Miss Willaman's
13   deposition to her affidavit which is Exhibit 1 and
14   your strategy is certainly clear to the extent
15   that you've provided an affidavit from
16   Miss Willaman in the Johnson litigation, a
17   declaration from Mr. Ford, and a number of
18   exhibits apparently from the Johnson case that you
19   intend to ask this witness about, even though this
20   is not the Johnson case and even though her
21   deposition is limited to her affidavit.
22        So with that, we will take each question as
23   you ask it.
24        MR. STOLL:  All right.  Fine.  And

53

1    the fact that these are from the Johnson case,
2    also the Stewart case, also the Leroy Fahrenholtz
3    (phonetic) case and every case that we've
4    litigated make no difference as to whether it's
5    cross-examination of this expert, but let's just
6    go question for question.
7              MS. SLAVIN:  Oh, no.  She's not an
8    expert, Brad.  She's a fact witness as the judge
9    pointed out at the hearing.
10             MR. STOLL:  Did I use the word
11   expert?
12             MS. SLAVIN:  Yeah, you did.
13             MR. STOLL:  Okay.  Well, then the
14   record will stand.
15             MS. SLAVIN:  Okay.
16             MR. STOLL:  But I don't -- that's
17   not my -- that was not my intention.
18             MS. SLAVIN:  Fair enough.
19   Q.  Now, the question, Miss Willaman, back to business.
20   You mentioned Textron Realty Corporation as the
21   owner of the building at 40 Westminster Avenue.
22   Did I say that correctly?
23   A.  It's 40 Westminster Street, and Textron Realty
24   Corporation is the owner of record of that

54

1    building.
2    Q.  Okay.  And does Exhibit Number 3 reflect that
3    Textron Realty Corporation is the owner of that
4    building?
5              MS. SLAVIN:  I'm just going to
6    lodge an objection.  I'm not going to instruct her
7    to answer on this, but I am lodging an objection
8    to any questions on Exhibit 3 as beyond the scope
9    of the judge's August 20 order, but you may
10   answer.
11             MR. STOLL:  Okay.
12   A.  Textron Realty C-o-r-p-o, abbreviated, is
13   shown here under owner information on the first
14   page of this exhibit.
15   Q.  Okay.  And what is Textron Realty Corporation?
16   A.  It's a wholly owned subsidiary of Textron,
17   Inc., incorporated in the State of Delaware.
18   Q.  Down below, it says, "Building Information:  Number
19   of units, 92."
20        Are you able to explain what -- I guess what
21   I'm -- let me ask it this way.  Does 40 Westminster
22   Street only house Textron, Inc.?
23   A.  No, sir.
24   Q.  Does it only house Textron, Inc. businesses --

55

1    A.  No, sir.
2    Q.  -- whether they're subsidiaries -- okay.
3         Are there tenants at 40 Westminster Street
4    that have nothing to do with Textron, Inc.?
5    A.  Yes, sir.
6    Q.  Okay.  Other than restaurants and cleaning
7    facilities and stuff like that, does that answer
8    still stay the same?
9    A.  Yes, sir.
10   Q.  Okay.  Is Avco Corporation also located at that
11   address?
12   A.  It is not a tenant.
13   Q.  Is Avco Corporation a business subsidiary of
14   Textron, Inc.?
15   A.  It's a wholly owned subsidiary of
16   Textron, Inc., yes.
17   Q.  Okay.  Does Avco Corporation have any employees in
18   the State of Rhode Island?
19   A.  I don't know if Avco Corporation has any
20   employees in the State of Rhode Island.  They could
21   have a salesperson in Rhode Island that I don't
22   know about, but it does not have any employees in
23   this building.
24   Q.  Okay.  And, therefore, my next question would have

56

1    been how many offices in that building are
2    dedicated to Avco Corporation?  Can you answer that
3    question?
4    A.  There are no offices of Avco Corporation in
5    that building.
6    Q.  If you would, how many offices does Textron, Inc.,
7    and I don't mean specific offices, I mean how many
8    floors at 40 Westminster Street are used by
9    Textron, Inc.?
10   A.  Floors 14 through 24 are used by Textron, Inc.
11   Q.  Are any of Textron subsidiaries located on floors
12   13 and below?
13             MS. SLAVIN:  Object to the form.
14   A.  Yes.  Textron Financial Corporation has
15   several floors in the same building.
16   Q.  Any other subsidiaries that we haven't mentioned?
17   A.  Textron Innovations, Inc. has its offices at
18   40 Westminster.  It's a wholly owned subsidiary.
19   Q.  Okay.  I just wanted to -- let's move on from
20   Exhibit 2.
21   A.  Okay.
22             MS. SLAVIN:  That's Exhibit 3.
23             MR. STOLL:  Yes, you're right.
24   You're right.  That was Exhibit 3.

RHODE ISLAND COURT REPORTING, INC.
(401) 437-3366

57

1      Now, there's a document in the package which
2 I sent which has a cover page of Exhibit 2 which
3 will be the next exhibit that I would like to
4 speak about.
5      MS. SLAVIN: And we're going to
6 mark this as Exhibit 4? All right. I'm going to
7 lodge the same objection to Exhibit 4 that I've
8 lodged before, Brad, although, again, I think I'm
9 going to allow the witness to answer on it. I
10 think --
11      MR. STOLL: And I'll lodge my same
12 response and then we can proceed.
13      (PLAINTIFF'S EXHIBIT 4 MARKED FOR
14      IDENTIFICATION)
15 Q. Miss Willaman, have you ever seen Exhibit 4 before?
16 A. No, sir, I have not.
17 Q. Does Exhibit 4 accurately depict the hierarchy of
18 Textron, Inc. and its subsidiaries?
19      MS. SLAVIN: At what point in time,
20 Brad?
21      MR. STOLL: 2007.
22 A. Actually, no, it does not.
23 Q. Okay. What have you found on Exhibit 4 which is
24 not accurate of 2007?

58

1 A. By 2007, we had sold our worldwide fastening
2 systems business. So many of the companies that
3 are listed here were no longer part of Textron by
4 2007. In particular --
5 Q. Okay.
6 A. Okay, go ahead.
7 Q. I was only going to interject to see if you
8 could -- I want to check them off --
9 A. Sure.
10 Q. -- of my list.
11 A. Okay. On what's identified as page 30.
12 Q. Yes.
13 A. The last four items on the page beginning with
14 Burkland Textron, Inc., that is no longer -- that
15 was sold. And then the last two items on the page,
16 Textron Fastening systems (Branch) Stanfield and
17 Rockford, those were sold.
18 Q. Was Tempo Research and Textron Atlantic sold, as
19 well?
20 A. No.
21 Q. Okay.
22 A. And going to what is identified as page 31,
23 the first three items, Textron Fastening Systems
24 branches in Sterling Heights, Logansport and Santa

59

1 Ana. The next one sold would be the fifth item,
2 Textron Fastening Systems - Flexalloy, Inc.
3 (Division), Streetsboro. The next item, the name
4 isn't correct. It was Elko Thermoplastic, Inc.
5 The next one, Wolverine Metal Specialties, that was
6 sold. Detroit Heading Company was sold. The
7 following one, Peiner Umformtechnik, it's
8 U-m-f-o-r-m-t-e-c-h-n-i-k, and Peiner is
9 P-e-i-n-e-r, that was sold. Textron Fastening
10 Systems Limited was sold. Textron Fastening
11 Systems Pty. Ltd. was sold. Textron Fastening
12 Systems site, s-i-t-e, next word d-e, next word
13 C-r-e-t-e-i-l, that was sold. Textron Fastening
14 Systems site, s-i-t-e, next word d-e, Vieux Conde,
15 V-i-e-u-x C-o-n-d-e, that was sold. The next one,
16 I'm not a German speaker, Textron
17 Verbindungstechnik,
18 V-e-r-b-i-n-d-u-n-g-s-t-e-c-h-n-i-k, next word
19 Beteiligungs, B-e-t-e-i-l-i-g-u-n-g-s, GmbH, that
20 was sold. And the last one on that list, Textron
21 Verbindungstechnik,
22 V-e-r-b-i-n-d-u-n-g-s-t-e-c-h-n-i-k, GmbH & Co.,
23 C-o, O.H.G., that was also sold.
24      Let me just finish looking through these.

60

1 Also, by 2007, page 31 at the very bottom, we had
2 sold the Holland, H-o-l-l-a-n-d, and Berne,
3 B-e-r-n-e, operations of Micromatic,
4 M-i-c-r-o-m-a-t-i-c. And on page 32, the third
5 item from the bottom, Avdel, A-v-d-e-l, K.K., that
6 was also sold as part of the fastening systems
7 business.
8 Q. Okay. With the elimination of those entities,
9 would this be an accurate depiction -- would this
10 be an accurate snapshot of what Textron, Inc.
11 looked like in 2007?
12      MS. SLAVIN: I'm going to object to
13 the form. And certainly based on the witness'
14 testimony, that's neither accurate nor a snapshot,
15 but the witness may answer.
16 Q. I'm sorry.
17 A. This doesn't --
18 Q. Ma'am, I'm sorry. I don't want to say anything
19 inaccurate. I thought that you had said that this
20 document was not accurate because certain entities
21 had been sold.
22 A. That is correct, and it is also missing a
23 number of entities, as well.
24 Q. Okay. Now, would you be kind enough to tell me how

61

1     many -- is it a lot of entities or is it a few?
2     A.   It's missing a number of international holding
3     companies.  This list is also a mixture of
4     subsidiaries, unincorporated operating divisions
5     and plant locations.
6     Q.   Okay.  How about this?  How about --
7          MS. SLAVIN:  Brad, I don't think
8     she was done.  Are you done?
9          THE WITNESS:  Yeah, I'm finished.
10         MS. SLAVIN:  Okay.  I'm sorry,
11    Brad.
12    Q.   I'm sorry.
13    A.   That's all right.
14    Q.   How about this?  Going to page 30, is the
15    description of Avco, is that accurate?
16    A.   Well, at some point in 2007, we acquired
17    United Industrial Corporation and AAI.  That is not
18    listed here.
19    Q.   That would be listed under Avco?
20    A.   Yes, sir.  And there are, again, are some
21    companies missing under Avco Corporation, and not
22    all of the -- not all of the ownership as it's set
23    out here is correct, either, for any number of
24    these.

62

1     Q.   Okay.
2     A.   I don't know --
3     Q.   I didn't mean to interrupt you.
4     A.   I don't know how this list was generated or
5     what the source is, but it's also missing a fair
6     number of subsidiaries under Textron Financial
7     Corporation on page 32.
8          This shows a load date at the end of page 32
9     as of January 8 of 2007.  So my comment about
10    United Industrial Corporation, that was acquired
11    later in that year.  So, of course, it would not
12    show up on this document.  I was mistaken.
13    Q.   Okay.  But it's correct that Avco Corporation --
14    the relationship between Avco and Textron is listed
15    properly?
16    A.   Yes, it is.
17    Q.   And the relationship between Textron Lycoming
18    Division in relation to Avco is listed properly?
19    A.   Yes, it is.
20         MS. SLAVIN:  I'm going to object to
21    the form.  The division's name was changed in
22    2003.
23    Q.   Yes, to Lycoming Engines.  Are we on the same page,
24    Miss Willaman?

63

1     A.   Yes.  That's correct.
2     Q.   Okay.  So Textron Lycoming, if we call it Lycoming
3     Engines, it's the same entity?
4     A.   It is the same unincorporated operating
5     division of Avco Corporation, yes.
6     Q.   And it's currently called Lycoming Engines --
7     A.   Yes, it is.
8     Q.   -- correct?
9     A.   Yes, it is.
10    Q.   And as of and before 2003, it was called what?
11    A.   I believe it was Textron Lycoming.
12    Q.   Okay.  Textron Lycoming Reciprocating Engines
13    Division, does that ring a bell?
14    A.   Yes.  Yes, it does.
15    Q.   Okay.  And Textron Systems Corporation, is that
16    listed accurately in relationship to Avco?
17    A.   Yes, it is.
18    Q.   Is Bell Helicopter listed accurately in
19    relationship to Textron, Inc.?
20    A.   Yes, it is.
21    Q.   And am I correct that Lycoming Engines is not a
22    part of Bell Helicopter, Textron, Inc.?
23    A.   Did you say is or is not?  I'm sorry, I
24    couldn't hear you.

64

1     Q.   I said is not.  That Lycoming Engines is not a part
2     of Bell Helicopter, Textron, Inc.?
3     A.   That is correct.  It is not a part of Bell
4     Helicopter, Textron, Inc.
5     Q.   And down -- there's a company called HR
6     Textron, Inc.
7     A.   Yes, I see it.
8     Q.   What is HR Textron, Inc.?
9     A.   HR was a wholly owned subsidiary of
10    Textron, Inc. and it manufactured, it escapes me
11    right now, hydraulic -- hydraulics for aircraft
12    rocketry.
13    Q.   HR Textron, Inc. is separate from Avco Corporation.
14    Did I state that accurately?
15    A.   HR Textron, Inc. is a -- was a wholly owned
16    subsidiary of Textron, Inc. directly.
17    Q.   Okay.  Is it no longer a wholly owned subsidiary?
18    A.   It was sold.
19    Q.   Would you be kind enough to tell me when it was
20    sold?
21    A.   2009.
22    Q.   And is it also accurate to say then that when HR
23    Textron, Inc. was a wholly owned subsidiary of
24    Textron, Inc., that Lycoming Engines was not a part

65

1    of HR Textron?
2    A.   That is correct.  It was not a part of HR
3    Textron, Inc.
4    Q.   Okay.  I notice on this page --
5         MS. SLAVIN:  Brad, would this be a
6    good time to take a break, a comfort break?  I'm
7    sorry, I didn't mean to interrupt.
8         MR. STOLL:  No, that's okay.
9    Miss Willaman, we're going to take a break for a
10   little bit.
11        THE WITNESS:  Thank you very much.
12        THE VIDEOGRAPHER:  The time is
13   11:32 and we are going off the record.
14        (RECESS TAKEN)
15        THE VIDEOGRAPHER:  The time is
16   11:43.  This is the beginning of DVD number two in
17   the deposition of Ann T. Willaman.  We're back on
18   the record.
19   Q.   Miss Willaman, going back to Exhibit 4 which we
20   left off on.
21   A.   Yes, sir.
22   Q.   Avco Corporation is listed as being located in
23   Providence, Rhode Island.  Is there a physical
24   address where there is an Avco office?

66

1    A.   No, there is not.
2         THE VIDEOGRAPHER:  Excuse me.
3    Could I ask you to move your mike so it's pointing
4    up towards your mouth.
5         THE WITNESS:  Oh, sorry.
6         THE VIDEOGRAPHER:  You can put it
7    lower down on your collar if you want.  Like right
8    on your lapel is fine.  As long as it's angled up
9    towards your mouth, it will be fine.
10        THE WITNESS:  Is that better?
11        THE VIDEOGRAPHER:  Say that again.
12        THE WITNESS:  My name is Ann
13   Willaman.  Is that better?
14        THE VIDEOGRAPHER:  That's great.
15   Thank you.
16        THE WITNESS:  Hm-mmm.  I'm sorry?
17   Q.   Is it accurate -- you had answered my question and
18   then there was some discussion about your
19   microphone.  I have a new question to move on to.
20   A.   Okay.
21   Q.   Is it accurate to say that Avco Corporation -- let
22   me ask you this.  How come Providence, Rhode Island
23   is listed for Avco?
24   A.   Providence is often listed for Avco

67

1    Corporation on a lot of these documents.  When we
2    acquired Avco in 1985, the corporate office of Avco
3    which was formerly in Greenwich, Connecticut was
4    moved to Providence, Rhode Island and many of its
5    officers and its directors were physically located
6    in Providence, Rhode Island.
7    Q.   Has that changed?
8    A.   Yes.  Very few of its -- I'm the only
9    vice-president of Avco Corporation resident in
10   Rhode Island.  The rest of the officers are located
11   in Wilmington, Massachusetts or at Lycoming's
12   facility in Williamsport, Pennsylvania.
13   Q.   Is there a physical office which is dedicated
14   solely to Avco Corporation?
15        MS. SLAVIN:  Objection, asked and
16   answered.  And I don't know why we're taking a
17   principal place of business deposition, but go
18   ahead.  You may answer.
19   A.   There is no bricks and mortar office of Avco
20   Corporation.
21   Q.   What is the business of Avco Corporation?
22   A.   The business of Avco Corporation includes the
23   manufacture, design, manufacture and sale of piston
24   engine aircraft.  Avco Corporation is also the

68

1    parent of a number of wholly owned subsidiaries
2    that manufacture a variety of products.
3    Q.   And do those subsidiaries include Textron Systems
4    Corporation --
5    A.   Textron Systems Corporation --
6    Q.   -- and AAI?
7    A.   Textron Systems Corporation is a wholly owned
8    subsidiary of Avco Corporation, United Industrial
9    Corporation is a wholly owned subsidiary of Avco
10   Corporation, and AAI is a subsidiary of United
11   Industrial Corporation.
12   Q.   Does Avco and Textron, Inc. share the same
13   accountants?
14        MS. SLAVIN:  Object to the form.
15   A.   The same accountants?  Are we talking internal
16   accountants?  External?  I don't --
17   Q.   Let's start with who does Avco Corporation's
18   accounting?
19   A.   Lycoming manages its own financial books and
20   records, and its numbers along with the numbers of
21   Avco Corporation's other wholly owned subsidiaries,
22   such as Textron Systems Corporation, United
23   Industrial Corporation, AAI Corporation, are
24   consolidated by Mark Bamford who is an assistant

69

1     treasurer of Textron -- excuse me, of Avco
2     Corporation.
3   Q. And what is Mr. Bamford's position at
4     Textron, Inc.?
5   A. He is a director, and not a member of the
6     board of directors, but the position of director in
7     our corporate controller's department.
8   Q. And then from Mr. Bamford who collects the
9     financial information from those wholly owned
10    subsidiaries of Avco, does that information get
11    passed on to Textron?
12       MS. SLAVIN: Object to the form.
13   Q. Well, let me ask it this way. What is the purpose
14    of Mr. Bamford's collection of financial
15    information from the subsidiaries?
16   A. Because Textron, Inc. reports its financials
17    on a consolidated basis and they -- each business
18    unit's financials roll up through their segment or
19    their subsidiary and are consolidated so that we
20    have one set of financials for the corporation and
21    its divisions and subsidiaries and that is what we
22    file and make available to the public.
23   Q. In the form of an SEC filing?
24   A. Yes, sir. Our annual report on 10-K which

70

1     shows the year in full and we also file a quarterly
2    report on 10-Q each quarter -- the first three
3    quarters, excuse me.
4   Q. Now, I've provided a clip of documents which I am
5    holding. It's labeled Exhibit 14.
6   A. Okay.
7   Q. Which I don't want to mark the whole entire thing.
8    I've provided the whole document out of fairness to
9    you, but I really only have a question on a few
10    pages and we can just mark the cover page and the
11    pages.
12     My question to you is are you able to identify
13    this document marked as Exhibit 5?
14       THE WITNESS: You want to mark
15    this?
16       THE REPORTER: Well, I'm not sure
17    what he wants marked yet, so.
18   A. Okay. I have never seen this particular
19    document before. It appears to be a report put
20    together by a third party which pulls certain of
21    our public filings, including our 10-K, and it also
22    has in the back the names of a variety of lawsuits,
23    and there are a number of pages in the back which I
24    have no idea what they are because it's

71

1     gobbledygook.
2   Q. Okay.
3   A. But I —
4   Q. Then let's —
5   A. I can identify parts of this because it's part
6    of our public filings, but not the whole document
7    or the source.
8   Q. Let's see if you can identify the parts I would
9    like to speak about which are located on pages
10    three.
11       MS. SLAVIN: And before we go any
12   further -- I'm sorry, Brad. Go ahead.
13   Q. Let's take a look at pages three through ten or
14    three through 12 -- 11, I guess. Three through 11.
15       MS. SLAVIN: I'm going to lodge a
16   continuing objection to a document the witness has
17   never seen before, but I will allow her to answer
18   if she can.
19       MR. STOLL: I will attempt to lay
20   the appropriate foundation to allow Miss Willaman
21   to answer these questions.
22   Q. Miss Willaman, I'm looking at Page 3 of 317. Are
23    you on the same page?
24   A. Yes, sir, I am.

72

1   Q. I notice in small print on the bottom it says,
2    "Source: 10-K, 02/24/2006." Do you see that?
3   A. Yes, sir, I do.
4   Q. Are you familiar with the 10-K filed on
5    February 24, 2006?
6   A. Yes, I am.
7   Q. Okay. Are you able to testify -- well, let me ask
8    you this. Would the information appearing on
9    Page 3 of 17 appear to come from the Textron 10-K?
10       MS. SLAVIN: Well, wait a minute.
11   Brad, you don't have a copy of the 10-K here and
12   her familiarity with the document from four years
13   ago which isn't in front of her, I object, and she
14   can answer to the best she's able to answer.
15       MR. STOLL: Then you object.
16       MS. SLAVIN: I'm objecting.
17       MR. STOLL: You can object, but --
18       MS. SLAVIN: Okay. And the other
19   thing --
20       MR. STOLL: -- the manner in which
21   you are objecting is improper.
22       MS. SLAVIN: Well, the question --
23   no, sir.
24       MR. STOLL: -- identify the

73

1   information, she can do it, but, Cathy, you cannot
2   coach the witness.
3       MS. SLAVIN: I'm not coaching the
4   witness. The witness knows more about all of this
5   than both of us put together, Brad.
6       And just may I also lodge my objection, the
7   source of this document which you also didn't read
8   at the bottom of page three is "GSI, a division of
9   Thomson West." So, apparently, GSI is purporting
10  to attribute the 10-K from 2/24/2006, but I think
11  the more appropriate way to do this would be to
12  have the 10-K from 2/24/2006 in front of the
13  witness instead of asking her questions about what
14  a third party has done, and I object. I'm still
15  allowing her to answer, but I object. It's
16  totally inappropriate.
17      MR. STOLL: That's fine. It is not
18  totally inappropriate.
19      MS. SLAVIN: Sure, it is.
20      MR. STOLL: And your objection is
21  inappropriate because you just basically
22  testified, not testified, but imprinted. And
23  Miss Willaman is doing a fine job testifying and
24  she doesn't need your assistance.

74

1       MS. SLAVIN: Sir.
2       MR. STOLL: I'm going to ask her
3   questions about this document and if she can't
4   answer it, she is perfectly capable of telling me.
5   She does not need you to coach her.
6       MS. SLAVIN: I'm not coaching her,
7   Brad. It's an inappropriate question and I'm
8   putting my objection.
9       MR. STOLL: It is not. The
10  objection, as Judge Abramson has informed the
11  parties, the objections are to form, foundation
12  and the rules also allow you to object to preserve
13  a privilege and here, since there's a protective
14  order, you can object to the protective order, but
15  do not object in the manner in which you're doing
16  it because I don't want to have that fight with
17  you. Let's just ask the question and see if we
18  can move on.
19      MS. SLAVIN: So that we are clear,
20  actually, the portion of the colloquy from Judge
21  Abramson was on the usual stipulations to a
22  deposition in which objections other than to form
23  and privilege are reserved until the time of
24  trial. We did not begin this deposition with the

75

1   usual stipulation entered onto the record. So
2   please don't lecture me and allow me not to make
3   my record and to preserve an objection to a line
4   of questioning that you're sure to use or attempt
5   to use at some point in time. That's my
6   objection. I think it's inappropriate that you're
7   asking the witness about this. I'm objecting, but
8   I am allowing her to answer.
9       MR. STOLL: The way you just
10  objected was fine. It was the way you objected
11  before which wasn't fine, but let's move on.
12      MS. SLAVIN: Let's.
13  Q. Business Segments. Miss Willaman, there's a title
14  for Business Segments on this document. Do you see
15  that?
16  A. Yes, sir, I do.
17  Q. It says, and I'm going to quote from a section in
18  that first paragraph, it begins with, "A
19  description of the business done and intended to be
20  done by each of our business segments is set forth
21  below."
22      Is that language that comes from Textron, Inc.
23  in its 10-K?
24  A. This is -- it appears to be Textron, Inc.'s

76

1   10-K that has been pulled. So this would be
2   Textron, Inc. setting that forth.
3   Q. Okay. Now, the next line, it says the Bell
4   segment. What is the Bell segment? Is that Bell
5   helicopters?
6   A. In 2005, as it states there, it included the
7   business that manufactures Bell helicopters and it
8   also comprised Textron Systems.
9   Q. Okay. And my question for you, ma'am, is that as
10  of at least 2007, Textron Systems was listed under
11  Avco Corporation. Was that different in 2005?
12      MS. SLAVIN: Object to the use of
13  the term "listed under," but go ahead.
14  A. Textron puts its divisions and subsidiaries
15  into segments that have similarities, but the
16  segments do not necessarily track legal ownership
17  of the businesses in the segment.
18  Q. And that accounts for the grouping of Textron
19  Systems in the Bell segment?
20  A. That is correct. It's simply a management
21  grouping of similar businesses.
22  Q. And does that also explain why Lycoming Engines is
23  also listed in the Bell segment? And I am looking
24  on Page 5 of 317, and if I can direct your

77

1    attention to the top paragraph, four lines from the
2    bottom of that paragraph beginning with the word
3    "reciprocating."
4    A.   I'm sorry.  Could you repeat the question?
5    Q.   Sure.  I was really directing your attention to an
6    area.
7    A.   Okay.  I see.
8    Q.   It begins, "Reciprocating piston aircraft engines
9    are sold under the Lycoming name directly to
10   general aviation airframe manufacturers and in the
11   aftermarket through domestic and national --
12   international distributors."  Do you see that?
13   A.   Yes, I do.
14   Q.   And I guess the question I had was why was Lycoming
15   being listed under Bell, and you've answered that
16   by saying that the grouping of segments does not
17   track the corporate structure.  Did I state that
18   accurately?
19   A.   That is correct.  In this particular
20   paragraph, as I read it, it says that Lycoming,
21   it's included in under the Textron Systems piece
22   which is part of --
23   Q.   Oh, I'm sorry.
24   A.   -- which at the time was part of the Bell

78

1    segment.
2    Q.   Yes, you have corrected me, that Textron Systems is
3    the name of the company immediately above that.
4    A.   Right.
5    Q.   But we do agree that Lycoming Engines is not an
6    operating division of Textron Systems?
7    A.   It is not an operating division of Textron
8    Systems Corporation, no.
9    Q.   And I have it is an operating division of Avco
10   Corporation, we've established that, and I don't
11   see a listing for Avco Corporation in the
12   description of Textron's businesses.  Is that
13   generally how these 10-K forms are drafted by
14   Textron, Inc.?
15       MS. SLAVIN:  I'm going to object to
16   the form.  That goes -- 10-Ks go back a long time.
17   You can answer if you can.
18   A.   I didn't -- I don't write the 10-K.  So I'm
19   not sure what the regulations are with respect to
20   identification of exact legal ownership.  So I
21   can't really answer your question.
22   Q.   Do you recall a 10-K which listed Avco Corporation
23   as a business activity of Textron, Inc.?
24   A.   I cannot recall that, no.

79

1        MR. STOLL:  Okay.  Those are the
2    only questions I have with this exhibit.  And I
3    would ask that we can have the whole thing marked
4    or only the cover page up until page 11.  I would
5    ask for up to page 11, but your counsel can mark
6    the whole thing.
7        MS. SLAVIN:  I'd like the whole
8    thing.  Thanks, Brad.
9        MR. STOLL:  All right.
10       (PLAINTIFF'S EXHIBIT 5 MARKED FOR
11   IDENTIFICATION)
12   Q.   Miss Willaman, paragraph three of your affidavit
13   marked Exhibit 1.
14   A.   Yes, sir.
15   Q.   "My responsibilities as an Assistant Secretary
16   require that I remain knowledgeable on the general
17   lines of business pursued by Textron, its
18   subsidiary corporations and divisions."
19       Did I read that correctly?
20   A.   Yes, sir, you did.
21   Q.   Okay.  How do you stay current on the general lines
22   of businesses pursued by Textron and its
23   subsidiaries and divisions?
24   A.   Well, in addition to the fact that I work at

80

1    the corporate office and have for over 30 years and
2    have day-to-day knowledge of these businesses, the
3    description of our businesses are in a lot of
4    publications that I read, including our 10-Ks, our
5    10-Qs, our proxy statements, there are descriptions
6    of business on our website, and we have a Fact Book
7    which I refer to periodically which is also
8    available on our website and those go into a lot of
9    detail about the lines of business.  I also
10   subscribe to reporting services which provide news
11   releases about Textron, its products, its
12   businesses.
13   Q.   Okay.  With respect to Lycoming Engines, the
14   operating division of Avco, what specific documents
15   do you review to keep yourself current of its
16   general lines of business?
17   A.   The annual report and the Fact Book, and I
18   also get any news bulletins that may be issued on
19   Lycoming.
20   Q.   What are the sources of the news bulletins?
21   A.   It's a --
22   Q.   Let me ask.  I thought my question was vague, but I
23   guess -- my question was what are the sources of
24   the news bulletins?  Is that something that is a

81

1    Textron document or are we going out into the world
2    and finding news?
3    A.  There is a page on our website which has all
4    of our business unit news bulletins, and there's
5    also a service that provides, you know, information
6    that it gets on web for subscriptions, but the
7    Textron.com website has a complete listing of both
8    Textron, Inc.'s news releases, as well as those of
9    our business units, and I review that regularly,
10   and then the 10-K and the 10-Q.
11  Q.  And I understand that that -- those sources are
12   publicly available.  Anybody can go to the website
13   and find the information, correct?
14  A.  Correct.
15  Q.  And that includes the 10-K and the 10-Q, the fact
16   report, the Fact Book that you mentioned?
17  A.  Yes, sir.
18  Q.  And also you mentioned a service provides
19   information on the web.  Is that a service on your
20   website or something else?
21  A.  It's Google.
22  Q.  Okay.  So just understanding your identification of
23   that service, there's occasions when you're sitting
24   behind your computer and you Google Lycoming

82

1    Engines to find out information about the operating
2    division; is that correct?
3    A.  No.  If there is some sort of news bulletin
4    where Lycoming may come up as a division of
5    Textron, Inc. or as a division, a manufacturing
6    business belonging to the Textron family, because
7    the word Textron is in it, that is the way I would
8    get that message.  It's not --
9  Q.  That makes it clear.
10  A.  It's not specific to Lycoming.  It's all of
11   Textron's businesses.
12  Q.  Is there information which is not publicly
13   available that you review to stay abreast of the
14   general lines of business of Lycoming Engines?
15  A.  No, sir.
16  Q.  Okay.  Are there any meetings at Textron -- let me
17   rephrase that.
18    Are there any meetings between the folks at
19   Lycoming Engines with Textron, Inc. to discuss the
20   operating business of Lycoming Engines?
21    MS. SLAVIN:  Object to the form.
22  A.  Not that I'm aware of.
23  Q.  Is there an individual or group of individuals at
24   Textron, Inc. who are charged with the oversight of

83

1    Avco Corporation?
2    MS. SLAVIN:  Object to the form.
3    A.  There is no group of people who are
4    specifically tasked with oversight of Avco
5    Corporation.  The management of Textron, Inc. is
6    tasked with oversight of all of its business units,
7    both the unincorporated operating divisions and
8    subsidiaries as the ultimate parent corporation.
9  Q.  Is there an individual or group of individuals
10   tasked with oversight of Lycoming Engines?  I have
11   to ask that question since I asked the previous
12   one.
13  A.  Certainly.
14  Q.  You may have answered it already, but please
15   respond to that question.
16  A.  The management of Textron Systems Corporation
17   who are the officers of Avco Corporation have
18   responsibility for oversight of Lycoming.
19  Q.  Does Avco Corporation's vice-president also have
20   responsibility for oversight of Lycoming?
21    MS. SLAVIN:  Which one?
22    MR. STOLL:  Any of them.
23  A.  Well, for example, Mr. Kraft who is a
24   vice-president of Avco Corporation is the general

84

1    manager of Lycoming.  So he has day-to-day
2    responsibility for that operation.
3  Q.  Wouldn't it be accurate to say that all of the
4    officers of Avco Corporation, all the
5    vice-presidents have some oversight responsibility
6    of Lycoming Engines?
7    MS. SLAVIN:  Object to the form.
8  A.  Lycoming is part of Avco Corporation.  A
9    corporation's officers and directors are -- its
10   officers are responsible for the management of its
11   operations and, you know, certain officers have
12   deeper day-to-day responsibility than others, but
13   they're not, for example, like Mr. Kraft who is
14   physically located at Lycoming and serves as the
15   general manager for the facility.
16  Q.  Paragraph four of your affidavit --
17  A.  Four?
18    MS. SLAVIN:  Four.
19  Q.  -- provides, "My responsibilities as an Assistant
20   Secretary include the monitoring of each corporate
21   entity in the Textron organization, to ensure that
22   each entity is, and remains, in compliance with all
23   statutory requirements and corporate formalities."
24   What statutory requirements are you referring

85

1  to?
2  A. Corporate statutory requirements to hold
3  annual meetings, to have the correct number of
4  officers and directors, to have stock issued,
5  general corporate governance requirements pursuant
6  to the laws where the company is incorporated.
7  Q. And you mentioned corporate formalities. What
8  corporate formalities are you referring to?
9  A. Minutes, primarily, and certificates as
10  required.
11  Q. Now, you were also -- when you were an assistant
12  secretary at Avco, was it also your responsibility
13  to monitor each corporate entity in the Avco
14  organization to ensure that each entity is and
15  remained in compliance with all statutory
16  requirements and corporate formalities?
17        MS. SLAVIN: I'm going to object to
18  the form, but...
19  A. As an assistant secretary of Textron, Inc., my
20  responsibility is to monitor the subsidiaries, all
21  of our subsidiaries, and that would include the
22  subsidiaries of Avco Corporation.
23  Q. Right, but you were also the assistant secretary of
24  Avco at one point, were you not?

86

1  A. I am, sir, yes.
2        MS. SLAVIN: Still. Your verb
3  tense is wrong.
4  Q. Okay, my apologies.
5        And in that capacity, do you hold the same
6  responsibility to Avco aside from your role at
7  Textron?
8  A. Yes, I do.
9  Q. Now, you mentioned minutes. Are we talking
10  about -- what do you mean by minutes?
11  A. Minutes of meetings of board of directors or
12  the shareholders of an entity and if permitted by
13  state or jurisdictional law, they can act by
14  unanimous written consent, the consents are deemed
15  to be minutes.
16  Q. Do you read the minutes?
17  A. I draft them in most cases for many of our
18  subsidiaries, and those that I do not draft I do
19  read.
20  Q. Have you drafted minutes which addressed the
21  Lycoming Engines division of Avco Corporation?
22        MS. SLAVIN: Object to the use of
23  "addressed," but...
24  A. I have, I believe, drafted minutes at some

87

1  point in the last 25 years where Lycoming was
2  mentioned.
3  Q. Was that in your capacity as assistant secretary of
4  Textron?
5  A. No, sir. It was in my capacity as an
6  assistant secretary of Avco Corporation that I
7  drafted those minutes.
8  Q. Were there minutes addressing Lycoming Engines
9  where -- let me -- I'll strike that question. I'll
10  come back to it.
11        Were there minutes that you drafted -- were
12  there minutes that you drafted as the assistant
13  secretary of Textron which addressed Lycoming
14  Engines?
15  A. I only started drafting Textron, Inc. minutes
16  beginning in January of this year when I moved to
17  the Textron, Inc. Corporate Secretary's Department,
18  and I have not drafted any minutes of Textron, Inc.
19  board or its committees which speak to Lycoming.
20  Q. How are those minutes stored?
21  A. How are the minutes -- I didn't hear what you
22  said -- stored?
23  Q. Yes, ma'am.
24        MS. SLAVIN: Whose minutes? The

88

1  minutes she'd draft? Other people's minutes?
2        MR. STOLL: Minutes of
3  Textron, Inc.
4        MS. SLAVIN: Okay.
5  A. The minutes of Textron, Inc. are retained in
6  minute books which are located adjacent to my
7  office.
8  Q. Are they retained in electronic form?
9  A. They are now, but they don't -- I don't have
10  them in electronic form going back to, for example,
11  1928. More recently, they're available in
12  electronic form.
13  Q. Okay. Are they searchable?
14        MS. SLAVIN: Electronic? Hard
15  copy? Both?
16        MR. STOLL: The minutes, any of
17  them.
18  A. Searchable? I'm not...
19  Q. Yes, searchable. If you wanted to find out when
20  Lycoming Engines was referenced in the minutes, is
21  there an index? Is there a word search that can be
22  used?
23  A. Not that I'm aware of, no.
24  Q. Okay. How would the board of directors or any

89

1  entity or any person that Textron, Inc. if they
2  were looking up an issue in the minutes, how would
3  they search that?
4  A. They would have to get the minute books and
5  read through them.
6  Q. Okay. What types -- well, do the minute books at
7  Textron, Inc. address the 2002 crankshaft recall at
8  Lycoming Engines?
9      MS. SLAVIN: Object to the form.
10  A. I don't know. I would have to go back and
11  review the minutes for that year.
12  Q. Do you know, has anybody gone back and reviewed
13  those minutes for reference to Lycoming Engines for
14  this litigation?
15  A. Not that I know of.
16  Q. Okay. Did you have any responsibility for
17  responding to discovery requests in this
18  litigation?
19  A. Not that I'm aware, no.
20  Q. Nobody asked you to search for documents requested
21  by the Plaintiffs in this case? You don't recall
22  that?
23  A. No.
24  Q. Okay. And I just want to make -- all right.

90

1      MS. SLAVIN: It's beyond the scope
2  of the affidavit, Brad, but continue.
3  Q. Paragraph four, you mention monitoring each
4  corporate entity. How do you monitor them?
5  A. I have a checklist of items that I make sure
6  each company fulfills during the course of the
7  year, and in those instances where I do not
8  maintain the minute books physically and other
9  people work on them, I simply liaise with them to
10  make sure that these items have been handled. It
11  would include annual elections, making sure that
12  the share certificates, if issued, are properly
13  stored, very general governance type issues, making
14  sure that the minutes are complete, fully signed
15  and approved.
16  Q. Does it ensure there's periodic financial
17  statements of the various subsidiaries that are
18  being produced?
19  A. That is not my responsibility, the production
20  of financial statements.
21  Q. Is that a corporate formality, though, that you're
22  familiar with?
23  A. I am familiar with financial statements, yes.
24  Q. Does Mr. Bamford prepare the financial statements

91

1  for Avco Corporation?
2  A. Mr. Bamford does consolidate all of Avco's
3  financial statements, yes.
4  Q. Okay. And does he use certified statements or just
5  general statements; do you know?
6  A. I don't know.
7      MR. STOLL: And just bear with me.
8  I'm being quiet because I'm going through my notes
9  to streamline this so I don't ask duplicate
10  questions and to make sure that I don't make
11  Miss Slavin object.
12  Q. Miss Willaman, are you familiar with how
13  Textron, Inc. creates and monitors its website?
14  A. The website is --
15  Q. The Textron, Inc. website. I'm sorry, I thought
16  you were asking me a question. I didn't mean to
17  interrupt. I'm sorry.
18  A. That's all right. Our corporate
19  communications group designs the website and the
20  webmistress is a member of that department and
21  various other departments provide updates to the
22  information that is on the website and our business
23  units also provide us with information relating to
24  their businesses that's up there.

92

1  Q. So is it accurate to say that -- let me start over.
2  Does Textron, Inc. verify that the information
3  being posted on its website is accurate?
4      MS. SLAVIN: Before the witness
5  answers, I'm going to lodge an objection that this
6  line of questioning is beyond the scope of the
7  affidavit that is attached as Exhibit 1 and Judge
8  Abramson's August 20 court order, but I will allow
9  the witness to answer the question as I have the
10  other ones previously.
11      MR. STOLL: I lodge my same
12  response, but go ahead, Miss Willaman.
13  A. The website is maintained by the Corporate
14  Communications Department at Textron, Inc. and I do
15  not know what their process is for verifying the
16  information that is posted on our website.
17  Q. Miss Willaman, how is Textron notified of current
18  events at Lycoming Engines?
19      MS. SLAVIN: I'm going to object to
20  the form and also to the question as being beyond
21  the scope of the August 20 order.
22  A. I'm not sure what you mean by current events.
23  Q. Your affidavit provided a paragraph saying that
24  your responsibilities caused you to be

93

1    knowledgeable of the general business guidelines.
2    I'm not quoting you. Paragraph three, general
3    lines of business for you --
4    A. Yes.
5    Q. -- personally. My question to you is not you
6    personally, but Textron. How does Textron remain
7    knowledgeable about the goings on at Lycoming
8    Engines?
9         MS. SLAVIN: I'm going to object
10   again as an improper question beyond the scope of
11   the August 20 order and beyond the scope of the
12   affidavit marked as Exhibit 1, and I'm going to
13   let her answer this question, but I don't think
14   it's a proper one.
15        MR. STOLL: Okay, same response.
16   A. Lycoming, the unincorporated operating
17   division of Avco Corporation, reports up through
18   Textron Systems and Textron Systems reports up to
19   Textron. So through a tiered reporting system,
20   Textron, Inc. would be made aware of, as you call
21   them, events or issues with respect to Lycoming.
22   They would come up through segment management
23   reporting.
24   Q. Now, is this a periodic reporting or is this

94

1    something that is done on an as needed basis?
2    A. No, sir. It's absolutely periodic. It's done
3    every quarter in advance of the preparation of our
4    10-Qs and our 10-K. Each business unit is
5    requested to certify either that there are no
6    issues impacting or have the potential to impact
7    their business, and it just keeping going up from
8    one management level to the next. If there are
9    issues that impact their particular business unit,
10   they are described in detail. And, as I said, they
11   just keep going up the management chain, up through
12   their segment, and the segment delivers a final
13   report to Textron, Inc. that covers all of the
14   business units in that segment. And then the folks
15   at Textron, Inc. in Providence who have
16   responsibility for determining which items need to
17   be reported in our public filings will read all of
18   these reports and make that determination, but it
19   includes our entire executive management team and
20   the individuals who are responsible for all of our
21   major corporate departments, and that is done in
22   advance of each 10-Q or 10-K. And our CEO and/or
23   CFO are each required to personally certify that
24   full disclosure has been made and that we haven't

95

1    misstated any material items or neglected to report
2    any material items, items that would be material to
3    the entire Textron, Inc. organization.
4    Q. Do you know who the individual at Lycoming Engines
5    who generates that report, for lack of a specific
6    word, is?
7         MS. SLAVIN: Object to the form and
8    it's unlimited in scope. I mean, Avco was bought
9    out in '85. So we're talking about 25 years.
10   A. Presently --
11        MR. STOLL: I'm asking about
12   Lycoming Engines.
13        MS. SLAVIN: Well, Lycoming Engines
14   is an unincorporated division of Avco and we're
15   talking about a 25 year period when there would be
16   reporting to Textron. So, I mean, I think the
17   witness was about to answer presently. I just
18   have an objection to the breathtaking overbreadth
19   of that question.
20   Q. Okay, ma'am. Can you answer that on the present
21   day?
22   A. Can you repeat the question? I'm sorry. Is
23   it who provides the report on behalf of Lycoming?
24   Q. Who at Lycoming Engines or on behalf of Lycoming

96

1    Engines presents the report which discusses issues
2    at Lycoming Engines?
3         MS. SLAVIN: Object to the form.
4    A. It would be Mr. Kraft who's the general
5    manager and his management team.
6    Q. As long as Mr. Kraft has been the general manager,
7    has he always had that responsibility?
8    A. Yes. That's the responsibility of each of our
9    business unit heads.
10   Q. Do you recall when Mr. Kraft became general
11   manager?
12   A. No, I do not.
13   Q. Do you know who it was before Mr. Kraft?
14   A. It was Ian Walsh.
15   Q. Do you know who at Textron Systems currently is the
16   person who receives that information from Lycoming
17   Engines?
18        MS. SLAVIN: Object to the form.
19   A. I do not know who actually receives that
20   report at Textron Systems.
21   Q. Do you know by title of the person, what that
22   person's job is who would receive that report?
23   A. No, I do not.
24   Q. Okay. And then from Textron Systems, it goes to

97

1      Textron, Inc.; is that accurate?
2      A.  Textron Systems would aggregate the reports of
3      all of the business units that are within the
4      Textron Systems segment and then they would provide
5      the segment report to Textron, Inc.
6   Q.  And who at Textron, Inc. reviews and receives that
7      report?
8      A.  The executive management team would receive
9      it.
10  Q.  Do you know who the people on the executive
11     management team are?
12     A.  Yes, sir.
13  Q.  Would you identify them for me, please?
14     A.  Scott Donnelly, D-o-n-n-e-l-l-y, who is our
15     president and chief executive officer, Frank Connor
16     who is our executive vice-president and chief
17     financial officer, John Butler, B-u-t-l-e-r, who is
18     our executive vice-president and chief Human
19     Resources officer, and Terrence O'Donnell who is
20     executive vice-president, general counsel and
21     corporate secretary.
22  Q.  Ma'am, before you prepared your affidavit, what
23     documents did you review?
24     A.  Before I prepared this affidavit, did you say?

98

1   Q.  Yes.  What documents, if any, did you review?
2      A.  I would have reviewed the corporate minute
3      book for Avco, and I also had a good standing
4      certificate from the State of Delaware that
5      confirmed that the company was in good standing as
6      of recent date, and the rest of it is my personal
7      knowledge.
8   Q.  The corporate minute book at Avco, how far back did
9      that go that you reviewed?
10     A.  The corporate minute books of Avco go back to
11     1929.  I did not review them quite back that far.
12     I would really only review and ordinarily only
13     review the last year of minutes to make sure that
14     there's nothing that changes the information in
15     this affidavit.
16  Q.  Are you aware how Textron was notified of the
17     Lycoming crankshaft recall?
18     A.  No, sir, I'm not.
19         MS. SLAVIN:  Whoa, whoa, whoa.
20     That's beyond the scope of the affidavit,
21     Mr. Stoll, and I object to the question.  She's
22     answered no, but...
23         MR. STOLL:  Okay.  Miss Slavin, I
24     have some questions that I'm going to ask to

99

1      preserve my record.  And if you feel that they are
2      improper, you can lodge the appropriate
3      objections, but I do have some questions that I
4      would like to ask just to make the record.
5          MS. SLAVIN:  Well, not to worry, I
6      will object if I think that they're inappropriate,
7      but I certainly would expect that you are not
8      going to run afoul of the matters that are set
9      forth in the August 20 order which you are
10     precluded from asking about.
11         MR. STOLL:  No.  Well, I don't want
12     to fight with you on the record.  I do disagree
13     with how you just stated that.
14         MS. SLAVIN:  Well, the order speaks
15     for itself, and engine crankshafts and recalls are
16     category one and they're certainly category three,
17     as well.
18     So I'm just cautioning you that I'm
19     cautioning you that any questions in that regard
20     are beyond the scope of the order and are in
21     specific violation thereof, but you may proceed.
22         MR. STOLL:  Okay.  I will proceed
23     and you can instruct the witness how you feel
24     appropriate.

100

1   Q.  Was Textron advised of the crankshaft recall?
2          MS. SLAVIN:  I object.  That
3      question is in violation of the August 20 order.
4      You may answer.
5      A.  I don't know.
6   Q.  Do you have any knowledge about that issue?
7      A.  No.
8   Q.  As vice-president of Avco, it was never brought to
9      your attention?
10     A.  I know --
11         MS. SLAVIN:  I'm going to object.
12     Your question was how Textron -- whether Textron
13     was notified or how it was notified.  That's a
14     different question.
15         MR. STOLL:  No, no, no.  There was
16     a question in between that which I was asking
17     Miss Willaman if she had any personal knowledge of
18     it and I asked her do you know anything, do you
19     have any knowledge, and she -- well --
20         MS. SLAVIN:  Fair enough, Brad.  I
21     stand corrected.
22     A.  I'm sorry.  I thought you meant -- I thought
23     we were still on the Textron, Inc. question.  I
24     know --

## 101

1  Q.  No.  That's fair.
2  A.  -- about the --
3  Q.  That's fair.
4  A.  I apologize.
5  Q.  Okay.  How was that information transferred up the
6     corporate chain to Textron?
7       MS. SLAVIN:  I'm going to object to
8     the form.  I think it's beyond the scope of the
9     order and the witness' personal knowledge.
10 Q.  Ma'am, is that beyond your personal knowledge?
11 A.  I don't know how that information was made
12    known to Tex -- that specific information was made
13    known to Textron, Inc., no, I do not know that.
14 Q.  Do you know whether the course of action chosen at
15    Lycoming Engines on the crankshaft recall was
16    discussed and approved -- and/or approved by
17    Textron, Inc.?
18      MS. SLAVIN:  I object to the
19    question as being in violation of the specific
20    prohibition in the August 20 order.
21 A.  I do not know.
22 Q.  Okay.  Are you aware of a fund that Textron, Inc.
23    keeps to pay the liability and debts of its
24    subsidiaries?

## 102

1       MS. SLAVIN:  I object to that
2     question which is totally improper as being a
3     blatant violation of the August 20, 2010 order.
4       MR. STOLL:  I disagree.  There's a
5     question pending --
6       MS. SLAVIN:  And I've objected.
7     And you didn't move for reconsideration, and I
8     object to the question, and the witness may
9     attempt to answer.
10 A.  I do not know of any such fund.
11      MR. STOLL:  Okay.  I would like to
12    take five minute break to go over my notes --
13      MS. SLAVIN:  Sure.
14      MR. STOLL:  -- and see if there's
15    anything else.  Otherwise, Miss Willaman, you may
16    be finished, but just let me take a look at what I
17    have.
18      MS. SLAVIN:  Sure, Brad.
19      MR. STOLL:  So we'll go off the
20    record.
21      THE VIDEOGRAPHER:  The time is
22    12:40.  We are going off the record.
23      (RECESS TAKEN)
24      THE VIDEOGRAPHER:  We are on the

## 103

1     record.  The time is 12:47 p.m.
2  Q.  Ma'am, is there anyone at Avco Corporation -- let
3     me rephrase that.
4       Are there any officers of Avco Corporation who
5     are charged with risk management of Lycoming
6     Engines?
7       MS. SLAVIN:  I object to the form,
8     but...
9  A.  Officers of Avco Corporation who are charged
10    with, and what was the end?
11 Q.  Risk management, risk management of Lycoming
12    Engines.
13 A.  No.  Not specifically, no.
14 Q.  Is there any employee of Textron who bears a duty
15    to perform risk management of Lycoming Engines?
16      MS. SLAVIN:  Object to the form,
17    the use of the word "duty."
18 A.  Not specifically, no, not that I'm aware of.
19 Q.  Other than the reports that we discussed, and they
20    would be the reports that eventually filter
21    upstream for the 10-Q and the 10-K, other than
22    those reports, do you personally receive any
23    documents, correspondence or anything addressing
24    the Lycoming Engines division?

## 104

1  A.  No, I do not.
2  Q.  Are you aware if anybody else at Textron, Inc.
3     does?
4  A.  I don't know specifically if other people
5     receive information on Lycoming.  I would imagine
6     they do, but I do not.  That's purely a guess on my
7     part.
8       MR. STOLL:  Okay.  I have a number
9     of questions to ask, and I think I'm going to
10    preserve my record this way by saying that I have
11    a number of questions to ask on the issues which
12    are subjected to the court's order which Miss
13    Slavin is going to mark, and I want to complete
14    the deposition with preserving any ability to
15    appeal or otherwise that order to go into those
16    issues.  But at this time, I have nothing further
17    to request of you, Miss Willaman, but just wish to
18    state that should there be any subsequent ruling
19    on that order, that I would have many more
20    questions to ask.
21      MS. SLAVIN:  And I will just say
22    since we're preserving a record that this witness
23    was being produced pursuant to a consent order on
24    this date which I think we will also mark, that

105

1    you did not appeal the motion for reconsideration.
2    And I understand you've got to do what you've got
3    to do, but I don't agree that that's the
4    appropriate procedural posture.
5        And while we're at it, I'd like to, I think
6    we're up to six and seven, mark those two orders
7    for the record.
8        So I appreciate your position, Brad.
9    Obviously, I don't agree with it.
10        MR. STOLL:  Are you taking the
11    position that by not asking the questions, I am
12    waiving them?
13        MS. SLAVIN:  I'm not taking that
14    position.  I would like that you not put me in a
15    position where I have to instruct the witness not
16    to answer.  You've already asked a number of
17    questions that clearly run afoul of the court
18    order, so.
19        MR. STOLL:  That you believe run
20    afoul.  I don't believe they do.  We will agree to
21    disagree on that.
22        MS. SLAVIN:  And that we will.
23    But, you know, maybe it's for the judge to decide,
24    but if you're done, you're done.

106

1        But I would like to have those two orders
2    marked for the record as, I believe, six and seven
3    are the next exhibits.
4        MR. STOLL:  The consent order is
5    which?
6        MS. SLAVIN:  The order entered by
7    consent that Judge Abramson signed.
8        MR. STOLL:  Could you hold it up to
9    the camera for me?
10        MS. SLAVIN:  Ann, would you hold it
11    up.
12        MR. STOLL:  A little higher,
13    please.  Okay.  That's the one, okay.  There's an
14    order entered --
15        MS. SLAVIN:  Well, there are two
16    orders, Brad.
17        MR. STOLL:  -- by consent.  I know,
18    it's an order, but it was --
19        MS. SLAVIN:  In any event, I just
20    want them marked on the record, and I guess we'll
21    see where we go from here.
22        MR. STOLL:  Okay.  Miss Willaman,
23    thank you for your time.
24        THE WITNESS:  You're most welcome.

107

1        MR. STOLL:  And, again, I apologize
2    for the accommodations.
3        MS. SLAVIN:  Not a problem, Brad.
4    And the witness will read and sign.
5        THE VIDEOGRAPHER:  We all set?
6        MS. SLAVIN:  We're all set.  Thank
7    you, Brad.
8        THE VIDEOGRAPHER:  The time is
9    12:52.  This concludes the deposition.  This is
10    the end of DVD number two.  We are off the record.
11        (DEFENDANT'S EXHIBITS 6 & 7 MARKED FOR
12        IDENTIFICATION)
13        (DEPOSITION CLOSED AT 12:52 P.M.)
14
15
16
17
18
19
20
21
22
23
24

108

1                C E R T I F I C A T E
2        I, Linda S. Taylor, hereby certify that I am
    expressly approved as a person qualified and authorized
3    to take depositions pursuant to Rules of Civil Procedure
    of the Superior Court, especially but without
4    restriction thereto, under Rules 28 and 30(b)(4) of said
    Rules; that the deponent was first sworn by me; that
5    this deposition was stenographically reported by me and
    later reduced to print through Computer-Aided
6    transcription; that the foregoing is a full and true
    record of the proceedings; and that a review of the
7    transcript by the deponent was requested.
8        Pursuant to Rule 30(f) of the Rules of Civil
    Procedure, original transcripts shall not be filed in
9    court; therefore, the original is delivered to and
    retained by Plaintiff's attorney, Bradley J. Stoll, Esq.
10
        IN WITNESS WHEREOF, I have hereunto set my hand
11    this 14th day of September, 2010.
12
13
14
_____
15    LINDA S. TAYLOR, NOTARY PUBLIC/CERTIFIED COURT REPORTER
16
17    My Commission Expires 8/4/13.
18
19
20
21    DATE:  August 26, 2010
    IN RE:  Brent R. Miller, et al v. Piper Aircraft, Inc.,
22    et al
23
    EXAMINATION OF:  Ann T. Willaman
24

RHODE ISLAND COURT REPORTING, INC.
(401) 437-3366